## WARNER v. REPUBLIC STEEL CORP.

United States District Court
S. D. New York.
March 13, 1952.

Bondy & Schloss and Kleeberg, Greenwald & Lifflander, New York City (Norman P. S. Schloss, I. Russell Stein and Jacob Greenwald, New York City, of counsel), for plaintiff.

Pruitt, Desvernine & Coursen, New York City (H. Preston Coursen, New York City, of counsel), for defendant.

MURPHY, District Judge.

This is a suit for an accounting of some three million dollars in assets which were transferred in Ohio in 1925 by Jonathan Warner to the Trumbull Steel Company, a corporation of which Warner was founder and president. The plaintiff as administratrix of the estate of Warner, her deceased husband, commenced this action in March, 1945. Defendant is a successor by purchase to Trumbull, which was dissolved in 1928.

Jurisdiction is based upon diversity of citizenship: plaintiff is a resident of Pennsylvania; defendant, Republic Steel Corporation, is incorporated in New Jersey and since April 11, 1930, has been authorized to do business and has maintained an office in New York. Both plaintiff and Warner, it was stipulated, were never residents of New York.

Jonathan Warner was president and a director of Trumbull Steel Company which was organized in Ohio in 1912 and dissolved in 1928. He was an experienced and shrewd businessman who had dominated the affairs of Trumbull until within a few weeks of its acceptance of his resignation as president and director on September 1, 1925.

Warner was 68 years of age when he died in Philadelphia, Pennsylvania, on May 5, 1934. Upon his death a Charles LeMaistre was appointed his administrator. Later in 1940 Clara Warner, the plaintiff, became administratrix de bonis non. In 1942, ancillary letters of administration were issued to her by the Surrogate of the County of New York, New York. She brings this action under these ancillary letters.

The crucial facts in this action occurred in Ohio in August, 1925, during the course of transactions between Warner and John T. Harrington. The background leading to these transactions is important.

From the organization of Trumbull and until its dissolution, John T. Harrington and the law firm of which he was a member, were its general counsel. Harrington was also a personal acquaintance of Warner.

On July 25, 1925, Trumbull entered into an agreement with the National City Company of New York relating to the issuance by Trumbull of $17,500,000 in debentures which the National City Company underwrote and agreed to distribute on stipulated terms. In connection with this underwriting Warner furnished the National City Company with earnings statements and balance sheets of Trumbull up to May 31, 1925, prepared by the accounting firm of Ernst & Ernst. These debentures were offered to the public by the National City Company by means of a circular which included a statement of earnings reflecting the financial affairs of Trumbull. On the day these debentures were offered to the public in early August, 1925, the vice-president of the National City Company who had charge of the underwriting received telephone calls from two bankers, one in New York and the other in Pittsburgh. As a result of these, the vice-president immediately communicated with Warner and repeated what these bankers had reported, viz., that they had examined the circular and noted that the bank loans of Trumbull were stated to be in excess of $16,000,000 whereas they had recently received statements of Trumbull from Warner which showed that the bank loans were only $10,000,000. The vice-president then sent his assistant to Warner at the Trum-

bull office in Warren, Ohio, and Warner offered his explanation of the discrepancy.

Despite the acceptance of these explanations, the National City Company retained the accounting firm of Arthur Anderson and Company to investigate Trumbull's affairs. After its investigation the Anderson Company orally reported to National City Company that the balance sheet of Trumbull, which had been submitted by Warner in connection with the debenture issue, had over-stated Trumbull's inventory by approximately $3,000,000 and that the Trumbull books showed that expenses for repairs and maintenance had been improperly capitalized. The effect of the latter was an over-statement of earnings by approximately $5,000,000. Thereafter the agreement between the National City Company and Trumbull for the underwriting of the $17,500,000 debenture issue was rescinded and National City was reimbursed by Trumbull for expenses incurred in connection therewith. This cancellation took the form of a letter from Trumbull to National City on August 31, 1925.

An appraisal of the physical assets of Trumbull was made by the American Appraisal Company by spot-check on August 14 and 15, 1925. On September 23, 1925, the appraisers reported that Trumbull's inventory had been over-stated by some $3,000,000.

The crux of the case and the most controverted facts arise from transactions between Warner and Harrington during the latter part of August, 1925. These transactions have been testified to directly only by the plaintiff. Warner died in 1934 and Harrington in 1932.

The plaintiff worked for Warner as a stenographer commencing in 1911 in Warren, Ohio. Subsequently she became his secretary and did most of her work at his home. She has retained, and exhibited during the course of the trial, all of her stenographic notebooks from 1911 to and including 1925. She had kept a personal diary for Warner. In August, 1925, she had been his secretary; a year later she became his wife.

Leaving aside the question of the competency of the plaintiff (concededly the only person "interested" in the estate) as a witness, cf. N.Y.Civil Practice Act, § 347, Mrs. Warner testified that on August 13, 1925, Warner told her to lay out some securities for Harrington. This she did by taking them from the safe, making a list and handing them to Warner. On the same day, Warner wrote to his daughter, Elizabeth Clarke, asking for securities which he had once given to her, stating, "I may need the Trumbull Steel especially," and promising to see her, "as soon as I can get this mess straightened out."

Plaintiff further testified that on some day between August 17 and 20, 1925, Warner told her to bring him a book in which he kept an inventory of all stock owned by him. As she brought it to him, she overheard Harrington, while pointing his finger at Warner, say, "John, if you ever dare mention that paper, I personally will see that you go to jail." Harrington stopped when the plaintiff entered the room, her testimony continued, then said, "You don't understand, seem to understand, that you are in a serious position at Trumbull. I am your friend and I think I am about the only one that can help you. John, you may even be facing jail, and I don't know why I have to keep repeating these things but you certainly knew it was illegal to give bonus stock. Well, all that stock will have to be returned or somebody is going to have to pay for it; and that running account of yours is absolutely illegal. We are going to have the accountant go over it, but it certainly looks as if you are going to owe the company some money, maybe a large amount of money; and you sold that Sheet & Tube stock and paid your own personal loan with it. That belonged to the Trumbull Steel Company." According to the plaintiff, Harrington continued, "You also gave a false statement to the National City Bank." When Warner replied that he had used Ernst & Ernst's statement, Harrington said, according to the plaintiff, "Well, the American Appraisal over the past week have made an actual physical inventory and that statement is all wrong;

and you knew that it is a very serious matter to make false representations to banks. You could go to jail for that. Why, John, right at this minute there is talk up at the Trumbull Steel Company of indicting you, and with all this uproar, it isn't even safe for you to leave this house. If you are sensible, you will get some extra police protection." Warner then gave Harrington the stock inventory book and Harrington "priced" various stocks in an attempt to estimate the total. Warner also handed over to Harrington four life insurance policies.

Plaintiff's testimony is that on August 22nd Warner gave Harrington some stock certificates which Warner had obtained from his daughter, Mrs. Clarke, and which Harrington appraised. The plaintiff also testified that she was shocked when Harrington demanded the deeds to Warner's city and farm properties. She told Warner, according to her testimony, that he did not know whether he owed Trumbull anything or not. But Warner said that he trusted Harrington, and Harrington advised her: "I have told Warner to give over practically everything he owns to Trumbull Steel until they know where he stands on these bonus matters. We don't know what he owes and we won't know until they go over the books and find out just what condition everything is in. I assure you that I am going to see he is not charged for anything he should not be charged for." Harrington also promised, according to the plaintiff: "If the auditors prove there is a debt, we will have to sell enough of these securities to pay off the debt. I assure you that every penny will be accounted for. Now, if they find Mr. Warner does not owe anything, there won't be any harm done. Trumbull Steel Company is going to turn over stuff over [sic] to him. You don't have to worry about this house. Nothing is going to happen to the house." Harrington also advised payment for remodeling work being done on the premises. "Warner wants the work finished, he will be back before long." With respect to the expenses of running the farm, Harrington advised payment of bills for a couple of months, "if you want to, but just carry on everything as you have been doing." Plaintiff then offered proof of checks for remodeling and other work on the farm, one of which was dated August 20th and cleared the bank on August 27th. This check, plaintiff says, was handed to the remodeler on August 24th. Deeds and bills of sale for Warner's properties were also dated August 24th and describe the grantee as "Harrington, trustee". These will be more fully described below.

On August 23rd, plaintiff testified that she confronted Harrington in the presence of Warner and his housekeeper, Miss Palmer, with a rumor that Harrington would leave Warner "naked as the day he was born" and that she would be out of a job. Harrington, she testified, said that if Warner did not trust him and wanted it all written down, Warner had better get someone else to look after the matter. Warner, she testified, said that he did not want to offend Harrington, and Harrington reiterated his promise, "if there isn't anything to all this and the auditors do not prove a debt, everything is going to be returned to Warner. Mr. Warner will get everything else back."

On August 24th, plaintiff testified she turned over deeds to Warner's properties to Harrington's law office, engaged extra police protection for Warner and received from Harrington a list of securities which had been turned over to him. On August 25th, plaintiff made a complete list of all securities turned over. On August 26th, Warner left Warren, Ohio, never to return.

It is upon these conversations that plaintiff principally relies for her claim against defendant. In passing, it should be noted that plaintiff made no notes or memoranda concerning these conversations although she made and retained notes and diary for the entire period of her employment with Warner.

What happened to the transferred assets and the participants after these conversations, for purposes of this decision, should be briefly described. As to the assets, as already noted, the American Appraisal Company made a spot check on August 14th and 15th indicating a $3,000,000 shortage in Trumbull. The auditors from Ernst & Ernst estimated in September that Warner owed Trumbull more than $3,000,000. On

September 23rd, the Trumbull Board of Directors issued a statement that Warner turned over 59,012 shares of common stock of Trumbull and personal holdings worth $1,533,618.82 in "payment by Mr. Warner of his personal indebtedness * * * estimated by the Auditors at $3,040,000.00." This statement was published in a Youngstown newspaper and called to Warner's attention the following month by his son-in-law, Edward Clarke. The statement indicated that the holdings would be carried in the name of a trustee to facilitate disposal. The ledgers of Trumbull carried them as "the Warner Trust Fund." Most of these holdings were liquidated in 1925 and 1926 and the proceeds turned over to Trumbull in cash. In 1928, Trumbull was dissolved upon purchase of its assets by Republic Iron & Steel Company. In 1930, the latter was succeeded by the present defendant. On neither of these occasions is there evidence of any reference to the Warner-Harrington transactions. The defendant continued liquidation of the assets remaining from these transactions—collecting the surrender value of four insurance policies in 1932, selling a painting in 1935, and receiving sundry liquidating dividends in 1936, 1939 and 1948. It still has on hand some worthless shares.

Harrington executed a declaration of trust dated August 24, 1925, in connection with receipt of deeds from Warner describing himself as trustee for Trumbull solely. In December, 1925, he became president of Trumbull. In late 1925 or early 1926, he called the plaintiff several times, according to her testimony, offering her a job and expressing doubt whether Warner would ever return because Warner owed Trumbull too much. In disposing of Warner's real property, Harrington described himself in August 1926 as trustee for Trumbull and is similarly referred to in a quitclaim deed to correct an erroneous description executed by Warner himself in France on November 18, 1926. But whoever the beneficiary, Harrington was not an entirely faithful trustee. With Stevens, a codefendant in this action who has settled plaintiff's claim against him, Harrington fraudulently appropriated certain stock for $20,000 which was worth many times that amount. Harrington died in 1932.

Warner left Ohio on August 26, 1925 for his daughter's home in Hyannisport, Massachusetts. He kept in touch with the plaintiff in Ohio by mail. In October he fulfilled his pledge to a local community chest and made a contribution to a local church in Ohio. He indicated to plaintiff that he "will be glad to get back." The announcement of Trumbull of "the payment by Mr. Warner of his personal indebtedness as is disclosed by the recent audit" as it appeared in the Youngstown *Vindicator* of September 24th, was exhibited to Warner by his son-in-law, Clarke, in the latter part of October. Clarke testified that Warner remarked that they must have added on quite a bit of interest to create such a large indebtedness. Warner spent some time in New York with his daughter, visited Europe from February to May, 1926 with her family and returned to Europe again on October 9th. A month later he married the plaintiff in France and on November 18th executed there the corrective quitclaim deed already mentioned which described Harrington as trustee for Trumbull. While in Europe Warner, in order to avoid disclosing his whereabouts, received his mail by a circuitous route and on November 24, 1930 a letter from his daughter advised him not to sue because he was fortunate to be where he was. In May, 1931, he returned to the United States, took up residence in comparative poverty in Philadelphia and died there on May 5, 1934. Warner never returned to Ohio since his departure on August 26, 1925, and never asserted a claim against anyone arising out of his transactions with Harrington.

The plaintiff, sole survivor of the triumvirate in the transactions of August, 1925, moved out of Warner's house on September 17, 1925 and took furniture and records to his son-in-law's home in Ohio. She continued her correspondence with Warner. A week after Warner's departure for Europe on October 9, 1926, she followed, and married him in France the next month. Six weeks after his death in 1934, she returned to Ohio to visit her sister at Gerard. Her sister, she reports, advised her not to

go to Youngstown because she might get shot. Three times in 1937 plaintiff wrote without reply to defendant concerning Warner's rights arising out of his transactions with Harrington: On August 14th and 20th to vice-president Gillies and on November 8th to chairman-of-the-board Girdler. In 1940, she consulted a lawyer in Cleveland, Ohio, about a possible refund of income taxes paid by Warner on the bonus stock of Trumbull which was turned over to Harrington on the theory that if Warner had wrongfully received the stock then he was not liable for taxes on it. In September, 1941, she commenced an action against the Cleveland Trust Company to recover certain bonds previously delivered to the company by Warner. The trust company offered in evidence a direction to it signed by Warner and dated Hyannisport, September 18, 1925, authorizing delivery to Harrington. This action was discontinued by the plaintiff. On April 6, 1942, plaintiff commenced an action in Ohio against the present defendant, Republic Steel, alleging a trust, which action was dismissed for want of prosecution in 1944. Plaintiff then came to New York where she commenced the present action in March, 1945, against defendant Republic Steel and Stevens. Her claim against Stevens has been settled.

This action arising from transactions in August, 1925, was commenced nineteen years and seven months later. The principal question suggests itself: whether or not this action is barred by the passage of time. Since the applicable statute of limitations may depend upon the legal basis of plaintiff's claim, i. e. upon its legal characterization, the transaction should be examined in the light of all its conceivable characterizations.

■■■■ The troublesome question of choice of the governing statute of limitations in a suit in the Federal courts where jurisdiction is based upon diversity of citizenship has been authoritatively resolved. The common law conflict-of-laws rule regarded the ordinary statute of limitations as procedural and consequently required application of the forum's own statute to the exclusion of any other. Restatement, Conflict of Laws §§ 603, 604 (1934). The

continental courts on the other hand, have generally viewed statutes of limitation as substantive. The latter rule has been considered more harmonious with factors significant for choice of governing law in a conflicts situation, Le Roy v. Crowninshield, C.C., D.Mass.1820, 15 Fed.Cas. No. 8,269, page 362, 2 Mason, 151, per Story, J., and so, as Justice Holmes reminds us, courts have been willing to depart from the common law view of the statute as procedural and affecting the remedy only and not the right "in cases where it has been possible to escape from that qualification by a reasonable distinction". Davis v. Mills, 194 U.S. 451, 454, 24 S.Ct. 692, 693, 48 L.Ed. 1067. See note, Cheatham, Goodrich, Griswold & Reese, Cases and Materials on Conflict of Laws (1951) pp. 377–378. In the Federal courts the problem of choice of an applicable statute of limitations had been complicated by the added dilemma posed by possible differences between Federal and State common law principles of conflict-of-laws. After almost a century under a different rule, it is now settled that a Federal court having jurisdiction of a suit upon the basis of diversity of citizenship, must follow the rules of the courts of the State in which it sits on common law as well as on statutory matters. Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188. The Erie principle controls also actions in equity, Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290; it also requires application of the conflict-of-laws rule of the State in which the Federal court sits, Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, as well as the proper statute of limitations of such State. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079.

At one time the New York rule on periods of limitations in cases before its courts with contacts in other States was a judge-made one which required application of the internal law of the forum. Ruggles v. Keeler, 1808, 3 Johns. 263, 3 Am.Dec. 482 per Chancellor Kent; Miller v. Brenham, 1877, 68 N.Y. 83. The legislature in effect overruled the latter case by adoption of a statute in the same year which "borrowed"

the internal period of limitation of the state of which defendant was a resident at the time the action accrued. N.Y.Code of Civil Procedure, § 390, effective May 1, 1877. Through a series of amendments, Id. § 390a, added by N.Y.Laws, 1902, c. 193; Civil Practice Act, § 13; N.Y.Laws 1943, c. 516, this statutory conflict-of-laws principle has assumed the form in which it applies to the present case.[1] As in most other states [see N.Y.Law Revision Commission, "Study relating to Application of Foreign Periods of Limitations (1943) Appendix A, pp. 65–85], the New York statute is a rule of alternate reference: for a cause of action which arises outside the state either the statute of limitations of the forum is applied or that of the state where the cause of action arose whenever the latter period is shorter than the corresponding New York period.

 Since defendant Republic Steel Corporation has been authorized to do business and has maintained an office in New York since 1930, it is considered a New York resident for purposes of this statute. McConnell v. Caribbean Petroleum Co., 278 N.Y. 189, 15 N.E.2d 573. Since

neither the plaintiff, Clara Warner, nor the deceased, Jonathan Warner, were residents of New York at any time when the cause of action under consideration may have arisen as it is alleged to have done in the State of Ohio, so as to come within the exception mentioned in § 13, N.Y.C.P.A. supra, note 1, governing law in this case is supplied by either the New York period of limitation or that of Ohio, whichever is shorter.

The statutory periods of limitation are similar in New York and Ohio so far as they apply in this case. Actions for conversion must be commenced within three years, Civil Practice Act, § 49(7), ones based upon contract obligations and fraud must be commenced within six years, Id. § 48(1), (5) and other actions, including ones based upon trusts within ten years in New York, Id. § 53; Rhinelander v. Farmers' Loan & Trust Co., 172 N.Y. 519, 65 N.E. 499.[2] In Ohio the periods are the same except that for actions based upon fraud the period is four instead of six years, Ohio General Code, §§ 11224, subds. 3, 4, 11227.[3] In determining whether or not the barrier of time affects the right to

---

1. C.P.A. "§ 13. *Limitation where cause of action arises outside of the state.*

"Where a cause of action arises outside of this state, an action cannot be brought in a court of this state to enforce such cause of action after the expiration of the time limited by the laws either of this state or of the state or country where the cause of action arose, for bringing an action upon the cause of action, except that where the cause of action originally accrued in favor of a resident of this state, the time limited by the laws of this state shall apply." (Clevenger's 1946).

2. C.P.A. "§ 48 (1) (5): *Actions to be commenced within six years.*

"The following actions must be commenced within six years after the cause of action has accrued:

"1. An action upon a contract obligation or liability express or implied, except a judgment and except as provided by section forty-seven and section forty-seven-a. * * *

"5. An action to procure a judgment on the ground of fraud. The cause of action in such a case is not deemed to have accrued until the discovery by the

plaintiff, or the person under whom he claims, of the facts constituting the fraud. * * *"

C.P.A. "§ 49 (7): *Actions to be commenced within three years.*

"The following actions must be commenced within three years after the cause of action has accrued. * * *

"7. An action to recover damages for an injury to property, except in the case where a different period is expressly prescribed in this article. * * *"

C.P.A. "§ 53: *Limitation where none specially prescribed.*

"An action, the limitation of which is not specifically prescribed in this article, must be commenced within ten years after the cause of action accrues."

3. Ohio General Code, § 11224 (3) (4):

"An action for either of the following cases, shall be brought within four years after the cause thereof accrued: * * *

"3. For relief on the ground of fraud;

"4. For an injury to the rights of plaintiff not arising on contract nor hereinafter enumerated.

"If the action be for trespassing underground or injury to mines, or for the wrongful taking of personal property,

1006

relief in this action, plaintiff's cause must surmount both the Ohio and New York hurdles.

█ Is there a conceivable characterization of these facts that will enable the plaintiff to surmount these periods of limitation? Plaintiff urges that an express trust was created. Several alternative arrangements of the parties in the tripartite trust relationship are intimated: Harrington as trustee with Warner as settlor and beneficiary; or Harrington as trustee with Warner as settlor and Trumbull as beneficiary; or Harrington as trustee with Warner as settlor and both Warner and Trumbull as beneficiaries; or finally Trumbull as trustee with Harrington as its designee or agent and Warner as both settlor and beneficiary. This last collocation is the one suggested by plaintiff as most favorable to her cause since clearly Republic could never be trustee of an express trust for Warner unless Trumbull had been such a trustee at some time to which Republic became sucessor on one theory or another. So it may be assumed, without deciding or considering that such is by any means the case, that Trumbull was trustee of an express trust with Warner its creator and beneficiary, and Harrington a designee or agent of Trumbull. The applicable period of limitation under this view of the transactions is ten years. N.Y.Civil Practice Act, § 53, supra, note 2; Ohio General Code, § 11227 supra, note 3. It may be that once a trustee has accepted the trust, he cannot thereafter disclaim. Restatement of the Law of Trusts, § 102(2); Brennan v. Willson, 71 N.Y. 502. But under an assumption that an express trust exists, "a

positive and open renunciation and repudiation by [the alleged trustee] of the trust * * * matured the cause of action here and set the statute of limitations running against it." Woolley v. Stewart, 222 N.Y. 347, 354, 118 N.E. 847, 849, reversing Id., 169 App.Div. 678, 685, 155 N.Y.S. 169, 174. See also Lammer v. Stoddard, 103 N.Y. 672, 9 N.E. 328; Spallholz v. Sheldon, 216 N.Y. 205, 110 N.E. 431; Bankers Trust Co. v. Dennis, 256 App.Div. 495, 10 N.Y.S. 2d 710, affirmed 282 N.Y. 635, 25 N.E.2d 981. It may also be the case that repudiation necessary to make the period of limitation begin to run cannot be established by a showing of mere lapse of time, cf. Matter of Meyer's Estate, 98 App.Div. 7, 90 N.Y.S. 185, affirmed 181 N.Y. 553, 74 N.E. 1120, but that an open assumption of ownership by the trustee or denial of rights of the beneficiary made known to the latter is necessary. Cf. Reitz v. Reitz, 80 N.Y. 538; Hartford Life Insurance Co. v. Douds, 103 Ohio St. 398, 136 N.E. 274. In the instant case, there is sufficient evidence to indicate that the statute of limitations began to run more than ten years before the commencement of this action.

The transactions giving rise to the alleged secret oral trust took place between Harrington and Warner some time in August, 1925, according to the plaintiff. After an estimate of Warner's alleged indebtedness had been reported to Trumbull, the minutes of a board meeting at which Harrington was present on September 23, 1925, set forth a statement of Trumbull's condition which refers to "the payment by Ex-President Warner of his personal indebtedness to the Company." [4] The minutes also

the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it be for fraud, until the fraud is discovered."
Ohio General Code, § 11227:
"An action for relief not hereinbefore provided for, shall be brought within ten years after the cause thereof accrued."

4. "Statement of the Condition of the Trumbull Steel Company, at the close of business July 31, 1925, as shown by the books of the company after giving effect to the recent appraisal of the Company's plant by the American Appraisal

Company, the recent inventory of the Company's supplies, spares, raw material, furnished products and goods in process by the same Company and the payment by Ex-President Warner of his personal indebtedness to the Company.
* * *
"There are two items in the statement that need explanation: the $1,533,618.82 item in the name of John T. Harrington, Trustee, on the Assets side and the 59,-012 common share item 'With Trustee' on the Liabilities side. These two items represent the payment by Mr. Warner

direct that the statement be mailed to all shareholders and both the plaintiff and Warner were shareholders at the time. The statement was also published in a Youngstown newspaper. There is, in addition, uncontradicted testimony of Warner's son-in-law that Warner was shown a copy of this statement as it was published in the Youngstown "Vindicator" of September 24th in the latter part of October, 1925. It seems futile to argue that this statement is consistent with the existence of a trust for Warner's benefit and not with one that excludes such arrangement. Nowhere does Trumbull consider itself a trustee for anyone. Indeed Harrington is named trustee "because this facilitates disposal and transfer." The beneficiary is solely Trumbull for the entire amount excluding any notion that Warner might share in a possible surplus. "(T)he Company stock turned in was taken at the same price as that at which it had been charged to Mr. Warner when issued and the other holdings, including the real estate, were taken at figures agreed upon by local business men familiar with their values as conservative. It is planned that at the earliest possible moment these holdings will be sold *and the proceeds turned over to the Company in cash.*" [Emphasis supplied.] Elsewhere the statement recites and accepts the auditors' estimate of $3,040,000 as the amount of Warner's indebtedness to Trumbull. The ledgers of Trumbull subsequently carried the transaction in accordance with this statement.

The deeds covering the transfer of real property by Warner in the transaction under consideration are also in open repudiation of an express trust with Warner as beneficiary. On August 24, 1925, Warner executed a warranty deed to Harrington covering a parcel of land in Trumbull county. This deed described Harrington "as trustee" with no indication of the identity of the beneficiary. Exactly one year later Harrington and Trumbull conveyed the same property to another person in a deed that recited:

"Whereas, at and prior to the 24th day of August, 1925, Jonathan Warner was indebted to the Trumbull Steel Company * * * in a large sum of money, and in part payment of the same, did on said date convey the premises * * * to John T. Harrington, as trustee for the said Trumbull Steel Company *. * *; and

"Whereas, said John T. Harrington, as trustee, and the Trumbull Steel Company, as cestui que trust, are now desirous of conveying the premises to Hugh W. Bonnell,

"Now, therefore, we, John T. Harrington and the Trumbull Steel Company as cestui que trust * * * do * *. * sell and convey the following described premises:"

In connection with this deed of August 24, 1925, Warner himself executed a quitclaim deed to correct an erroneous description on November 18, 1926, while he was in France. This deed stated: "Jonathan Warner, widower, the grantor, for divers good causes and considerations thereunto moving, and especially for the sum of one dollar ($1.00) and other good and valuable considerations, received to his full satisfaction of John T. Harrington, trustee for the Trumbull Steel Company, * * * grantee, has given, granted, remised, released and forever quitclaimed and does by these presents * * * quitclaim unto the said grantee * * * all such right and

of his personal indebtedness as first disclosed by the recent audit. This indebtedness was estimated by the Auditors at $3,040,000.00. Mr. Warner turned over to the Trustee all his holdings in the Company, namely, the 59,012 shares of common stock mentioned together with all of his other personal holdings, estimated to be worth the $1,533,618.82 above mentioned—these included his two residences in Youngstown and Trumbull County together with the contents thereof. In making the adjustment, the Company stock turned in was taken at the

same price as that at which it had been charged to Mr. Warner when issued and the other holdings, including the real estate, were taken at figures agreed upon by local business men familiar with their values as conservative. It is planned that at the earliest possible moment these holdings will be sold and the proceeds turned over to the Company in cash. They are now being carried in the name of a Trustee rather than that of the Company because this facilitates disposal and transfer."

title as he, the said grantor, has or ought to have in and to the following described piece or parcel of land:"

Covering this real estate, Harrington also executed a declaration of trust on August 24, 1925, describing himself as "grantee to hold in trust for the benefit of the Trumbull Steel Company and its successors", and declaring, "that I am nominated and named as grantee in said conveyances upon and in behalf of the Trumbull Steel Company as trustee, solely, and I do not claim to have any title or interest in said land or any portion thereof by virtue of said conveyance to my own use or benefit but solely to the use and benefit of said The Trumbull Steel Company and its successors."

These open declarations of public record, all of them available to Warner and some of them brought to his attention, characterize the Harrington-Warner transactions as a transfer of property by Warner to Trumbull in consummate satisfaction of Warner's indebtedness to the company with Harrington as trustee for Trumbull. This is clearly at odds with the plaintiff's theory that Trumbull was trustee of this property, or at least the surplus after payment of Warner's indebtedness, for Warner. To these declarations must be added open and equally adverse acts by the alleged trustee and its agent, some of which were within the knowledge of Warner and the plaintiff: the liquidation of the transferred assets, the major portion of which occurred in 1925 and 1926; and the disappearance of the alleged trustee Trumbull with the sale of its property and assets to Republic Iron & Steel Company pursuant to an agreement of April 26, 1928, which makes no mention of the alleged trust. In determining that all of these acts and writings amounted to open repudiation by the trustee of the trust, if one existed, for purposes of commencement of the statute of limitations, consideration must also be given to the total absence of any similar declarations in support of the trust urged by plaintiff. Indeed, from August, 1925, until his death on May 5, 1934, there is absolutely no evidence that Warner asserted a claim of any character against Trumbull, Harrington, Republic Iron & Steel Company, the defendant or anyone else with respect to his transactions with Harrington in 1925. This was so although he lived in comparative poverty for three years prior to his death with no evidence of infirmity of body or mind.

A second possible characterization of this action for purposes of the statute of limitations is one for an accounting based upon fraud which by some theory or other would make Trumbull and its successor Republic constructive trustees for Warner's benefit. Again alternatives are presented. The alleged fraud might have consisted of a supposed misrepresentation by Harrington to Warner that Trumbull would act as trustee for Warner of certain assets. The consequence of this, it is urged, made Trumbull and the defendant as its successor constructive trustees. Or the fraud in this hypothesis arose from a series of alleged misrepresentations made by Harrington to Warner which induced the latter to transfer property to Trumbull, with similar consequences of imposition of a constructive trust on Trumbull and the defendant. So again it may be postulated, without deciding or considering that such is at all the case in this action, that such misrepresentations were made. The applicable period of limitation under this assumption is six years in New York, Civil Practice Act, § 48(5), supra, note 2, and four years in Ohio, General Code, § 11224(3) ff., supra, note 3. In both jurisdictions, the cause of action does not accrue and so presumably the statute of limitations does not begin to run until "discovery by the plaintiff, or the person under whom he claims, of the facts constituting the fraud," Civil Practice Act, § 48(5), supra, or "until the fraud is discovered," General Code, § 11224, supra. If this theory of plaintiff's cause of action as constructive trust rests upon something other than fraud, then a ten year period of limitations under general statutory provisions, already discussed in connection with the assumption that an express trust was created, would be applicable without any discovery requirement, Civil Practice Act, § 53, supra, note 2; General Code, § 11227, supra, note 3.

It should be noted that plaintiff has abandoned at the close of trial this characterization of the action as one of constructive trust based upon fraud. Nevertheless assuming that such is the nature of the transactions, it is clear under the statutes of limitation in both Ohio and New York that the cause accrued at the time of discovery. If the fraud was that mentioned in the first alternative, *viz.* that Trumbull would act as trustee for Warner, then the evidence already considered as sufficient for open repudiation in connection with a theory of express trust would also suffice to establish discovery. If the fraud consisted of a series of misrepresentations calculated to induce Warner to transfer his property to Trumbull, under the second alternative, Warner might well have been aware of such fraud at the time the statements were made. The representations by Harrington to him that Warner had made false statements to the National City Company in connection with a debenture issue for Trumbull, or that Warner had illegally issued and accepted Trumbull money and shares of stock, were certainly matters about which no one was better informed at the moment than Warner himself who had made the statements and issued and received the shares and money. For Warner had been the dominant figure in the affairs of Trumbull for over thirteen years. The same is true of the plaintiff who at the time was Warner's personal secretary and had been acquainted with his transactions for many years. Moreover, according to a pencilled note [5] introduced by plaintiff as written by Warner, Warner apparently admits discovery of fraud. "H. [supposedly Harrington, according to plaintiff] said he would look after me and he certainly did not. If I had gotten a lawyer, he could not have done what he did, because it was done in this fraudulent way." There is no

date on this note, but even assuming that it had been written on the last day of his life in 1934, an action based upon fraud in 1945 would be barred. In addition, the plaintiff herself asserts that she made inquiry of defendant without reply as early as 1937 concerning her rights arising out of the Harrington-Warner transactions, which was longer than both the four and six year periods of limitation before the commencement of this action. Moreover "discovery" contemplated in New York and Ohio statutes is measured by an external standard and not merely a subjective one so that the term includes not only actual discovery but also a situation where discovery should have been made. "(W)here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him. He will be held, for the purposes of the statute of limitations, to have actually known what he might have known and ought to have known." Higgins v. Crouse, 147 N.Y. 411, 416, 42 N.E. 6, 7. See also Dumbadze v. Lignante, 244 N.Y. 1, 154 N.E. 645; Sielcken-Schwarz v. American Factors, 265 N.Y. 239, 192 N.E. 307; Bohm Bros. & Co. v. Cunningham, 7 Ohio Dec.Rep. 382; Talmadge v. United States Shipping Board, 2 Cir., 54 F.2d 240. And the burden of proving when the fraud was discovered as well as that it had not been discovered rests upon the plaintiff, and not the defendant. Shultz v. Manufacturers & Traders Trust Co., D.C., 40 F.Supp. 675, 686; Mason v. Henry, 152 N.Y. 529, 539, 46 N.E. 837.

Finally, if the action be characterized as one for breach of contract or conversion, there is no claim that it would not

5. "Important
"I did not even get or hire or see a lawyer. H. said he would look after me and he certainly did not. If I had gotten a lawyer, he could not have done what he did, because it was done in this fraudulent way. All papers signed were done under duress and with a promise to return to me, but it was done for the sole

purpose of getting something cheap and with the thought of later getting farm for himself. I really believe the farm cost H. nothing at all. H. unneedfully [?] did all to frighten directors to obey him, with the object of getting much for himself later, at a low or no cost price. H. told Miss Palmer he was looking out and protecting me."

1010

be barred after six years under the New York statute and after six or four years under the Ohio one, the periods of limitation running from the alleged wrongful acts in 1925. N.Y. Civil Practice Act, § 48(1), (4); Ohio Gen.Code §§ 11222, 11224(2).

The question of whether any of these periods of limitation are suspended by duress is raised by plaintiff who alleges that Warner was in fear of criminal prosecution in 1925 and subsequently refrained from assertion of any claim because of this fear. It must be seriously doubted whether under the New York period of limitation duress would have the effect of suspension. The statute, although making explicit provision for certain disabilities of the plaintiff which are excluded from computation of the time to commence the action, Civil Practice Act, § 43, omits any reference to this one. As the court said in Piper v. Hoard, 107 N.Y. 67, 71, 13 N.E. 632, 634, "I am unable to see how it could stop the running of the statute of limitations. The law provides for no such disability. We cannot add it to the statute. The new wrong might possibly give a new right of action, but could not suspend the existence of the old one." But even assuming that duress in a proper case might toll the statute of limitations, cases collected, Chatfield v. City of Seattle, 198 Wash. 179, 88 P.2d 582, 121 A.L.R. 1294, no such situation is presented here. If there was duress, as alleged, and we do not make a finding that such was the case, and it arose from a threat by Harrington, it could not have survived Harrington's death in 1932. If it arose from sources other than Harrington, it certainly could not have survived Warner's death in 1934 which left the plaintiff, who was aware of all of these transactions and alleged misrepresentations, free to assert any claim at that time. In short, if there was duress, it ceased at a time beyond the longest period of limitation possible in this action.

In considering this action barred by passage of time, we are not resting on technical ground unrelated to the merits involved. The statute of limitations is a legislative sanction for dismissal of an action because of a claimant's inaction. "The policy of statutes of limitation is to encourage promptness in the bringing of actions, that the parties shall not suffer by loss of evidence from death or disappearance of witnesses, destruction of documents, or failure of memory." Missouri, Kansas & Texas Ry. Co. v. Harriman, 227 U.S. 657, 672, 33 S.Ct. 397, 57 L.Ed. 690, quoted in Greenhill v. Delano, No. 1, 193 App.Div. 842, 845, 184 N.Y.S. 617, 619. Such has been the case in this action. It was commenced more than nineteen and a half years after the questioned transactions. Practically everyone who might bear witness to what then occurred, except the plaintiff herself, have died: Warner and Harrington, the principal participants; Fillius, an attorney for Warner; Blyth, the accountant in charge of the audit; seven of the eight members of the Trumbull board of directors at the time; the two members of Trumbull's advisory committee. Many records, reports and correspondence of the accounting firm, the National City Company and the deceased participants have been destroyed or are missing because of the passage of time. And this action is brought against a defendant which did not appear upon the scene until three years after the transactions in question as successor by purchase to Trumbull.

This disposition of the controversy makes unnecessary a determination of several other questions of law: Is the action barred by laches? Is the plaintiff a competent witness in testifying to transactions or communications between the principal participants in her presence? Were the alleged misrepresentations ones of fact or law, and if the latter, are they actionable? Were bonuses of stock and money from Trumbull to Warner illegal, and if they were, was any question about their validity barred by time limitation in 1925? May a corporation become trustee of an express trust without formality of acceptance of the trust by its board of directors? And if it might, may another corporation, its successor by purchase, assume the obligations of trustee without formal action with respect to the trust?

Judgment for the defendant.