KEARSE, Circuit Judge:
Bankers Trust Company (“Bankers”) appeals from a judgment of the United States District Court for the Southern District of New York, William C. Conner, Judge, dismissing pursuant to Fed.R.Civ.P. 12(c) Bankers’s complaint which sought, inter alia, treble damages pursuant to the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. §§ 1961-1968 (1982), for injuries suffered principally as a result of defendants’ bankruptcy frauds. The district court, in an opinion reported sub nom. Bankers Trust Co. v. Feldesman, 566 F.Supp. 1235 (S.D.N.Y.1983), found that the complaint failed to state a claim under 18 U.S.C. § 1964 (“civil RICO”) because the statute provides relief only for “distinct RICO injury,” i.e., injury caused by the pattern of racketeering activity rather than by the predicate acts that constitute the pattern. On appeal Bankers challenges the court’s interpretation of the statute. As set forth below, we are in substantial agreement with the district court’s interpretation, and we affirm the dismissal of the complaint.
I. BACKGROUND
The complaint alleges a scheme by the defendants to defraud Bankers through, inter alia, the concealment of assets subject to distribution in bankruptcy and the bribery of a'judge. Since the case comes to us on an appeal from entry of judgment on the pleadings pursuant to Rule 12(c), we set forth the facts as alleged in the complaint. Many of the allegations have been thoroughly detailed in the bankruptcy court’s opinion in In re Braten Apparel Corp., 21 B.R. 239 (Bankr.S.D.N.Y.1982), and the district court’s opinion affirming the bankruptcy court’s order, see 26 B.R. 1009 (S.D.N.Y.1983), familiarity with which is assumed.
The principal actors in the scheme were Braten Apparel Corp. (“BAC”), a corporation that owed Bankers some $4,000,000; defendant Milton Braten (“Braten”), an officer and principal shareholder of BAC; defendant Daniel Rhoades, an officer, director, and/or shareholder of BAC, and an attorney for BAC and Braten; defendant Herman Soifer, a shareholder of BAC; and Walter Feldesman, an attorney who represented BAC, Soifer, and defendant Brook- *513 field Clothes, Inc. (“Brookfield”).[1] Braten, Rhoades, and Soifer were also officers, directors, and/or shareholders of all of the other corporate defendants named in the complaint in the present action.
A. The Initial Bankruptcy Fraud
The initial fraud consisted of a complex scheme devised in 1974 by Braten, Feldes-man, and Soifer to enable BAC to eliminate, without payment, much of its $4 million indebtedness to Bankers while retaining valuable assets. In August 1974, BAC acquired all of the stock of Brookfield, an entity then having a net worth of more than $3 million. Prior to the acquisition, Feldesman, Braten, and Soifer agreed that Soifer would be given the apparent ownership of the Brookfield stock but would hold the stock in a secret trust for BAC while BAC filed a bankruptcy petition and gained a discharge of its indebtedness under Chapter XI of the then-applicable Bankruptcy Act of 1898 (“Bankruptcy Act”), 11 U.S.C. §§ 1-1103 (1976). To implement the plan, Braten and Soifer executed a sham “Shareholder’s Agreement,” drafted by Feldes-man, which provided that if BAC or Braten did not furnish a $250,000 loan to Brook-field by a specified date, BAC’s stock in Brookfield would automatically be transferred to Soifer. At the time this agreement was entered into, Braten, Feldesman, and Soifer knew that the funding condition would not be met; they intended that Soi-fer would hold the stock of Brookfield, safe from the claims of BAC’s creditors, only during BAC’s bankruptcy proceedings. Soifer was to return the stock to BAC following its discharge in bankruptcy.
On September 5, 1974, BAC’s stock in Brookfield was transferred to Soifer; on that day BAC filed its petition in bankruptcy. BAC did not list the Brookfield stock as an asset. Braten, Rhoades, Soifer, and Feldesman thereafter affirmatively misrepresented to Bankers and the bankruptcy court that BAC had, through failure to meet the Shareholder’s Agreement’s funding condition, lost its ownership of the stock. Through this and related misrepresentations, Feldesman and the individual defendants induced BAC’s creditors, including Bankers, to approve a plan of arrangement under which Bankers would receive payment of only 17-V2% of its claims and BAC would be relieved of more than $4.3 million of its debts. Had BAC’s stock in Brookfield been included in BAC’s plan of arrangement, BAC would have had assets sufficient to satisfy Banker’s claims in full.
BAC’s plan of arrangement was approved by the court in March 1976. In August 1976, Soifer returned the Brook-field stock to BAC. Soifer, Braten, and Rhoades then revealed to Brookfield’s auditors that BAC had in fact owned this stock all along.
In September 1976 Bankers commenced a proceeding in the bankruptcy court under Bankruptcy Act § 386, 11 U.S.C. § 786 (1976),[2] to revoke the confirmation of BAC’s plan of arrangement because of the fraudulent concealment of BAC’s ownership of the Brookfield stock. Following lengthy proceedings including a trial, the bankruptcy court revoked the confirmation in 1982, see In re Braten Apparel Corp., supra, 21 B.R. 239, finding that the individual defendants had devised and carried out a scheme to defraud by making false statements and oaths in BAC’s listing of the assets of the estate, and by intentionally concealing property of BAC. The bankruptcy court ordered BAC to “offer a plan which is realistic ... in. light of the fact that the debtor owns a valuable asset —Brookfield.” Id. at 263. This decision *514 was affirmed by the district court, see 26 B.R. 1009, and the district court’s decision was affirmed by this Court by summary order entered on September 1, 1983.
B. The 1982 Bankruptcy Fraud
In the meantime, however, BAC had entered into a new scheme to protect many of its assets from its creditors. Its principal action, again, was to transfer its stock in Brookfield. In January 1982, defendant Bennington Court Ltd. (“Bennington”) borrowed more than $8.9 million from a financing company called KB Business Credit, Inc. (“KBBC”). Bennington then gave these funds to several of the other defendants in this case. When the funds were not repaid, KBBC brought a civil RICO action for treble damages against BAC, Braten, Rhoades, and others. The defendants quickly settled the lawsuit by having BAC convey its stock in Brookfield — for little or no consideration — to defendant Todd Equipment Leasing Co., Inc., which in turn pledged the stock to KBBC. As a result, BAC was able to frustrate Bankers’s attempt in bankruptcy court to obtain some benefit from BAC’s earlier ownership of the stock of Brookfield.
C. The Frivolous Lawsuits and the Bribery of a Judge
The complaint also alleges that during the perpetration of BAC’s initial bankruptcy fraud, BAC and the individual defendants instituted several frivolous lawsuits against Bankers in New York State court, alleging that Bankers had breached a commitment to extend additional credit to BAC and seeking millions of dollars in damages. The only purpose of these suits was to hinder Bankers's collection of the debt owed to it by BAC. Each suit was summarily dismissed, but not without Bankers’s having to incur substantial legal expenses.
In August 1977, BAC instituted an action against Bankers in South Carolina based on claims similar to those asserted in the New York actions, seeking $195 million in damages. Braten brought another action in South Carolina, asserting claims, allegedly superior to those of Bankers, to funds in an escrow account derived from the sale of machinery in which Bankers had a security interest. Rhoades acted as counsel to a South Carolina law firm representing BAC and Braten in these actions and, according to the complaint, proceeded to bribe the judge before whom they were pending.
In 1978, while the actions were pending before Judge William H. Ballenger, Rhoades used a South Carolina corporation formed by him to assume a mortgage debt on which Judge Ballenger was personally liable to the extent of $100,000. Rhoades thereafter made payments on the debt as installments came due. Rhoades’s actions induced Judge Ballenger to render at least two decisions favorable to Braten and BAC: (1) in Braten’s action to collect from the escrow account, he appointed a former partner of the law firm to which Rhoades was counsel as a “special referee” with the power to deny Bankers a jury trial; and (2) in BAC’s $195 million damage action, he arbitrarily denied Bankers’s motion to dismiss. Judge Ballenger eventually recused himself from the escrow account action after citing a “possible conflict of interest,” and his special referee resigned. In the BAC action, the South Carolina Supreme Court reversed Judge Ballenger’s denial of Bankers’s motion to dismiss as an abuse of discretion. In the meantime, however, Bankers had expended more than $100,000 in defending the South Carolina cases.
D. The District Court’s Opinion
Bankers’s complaint alleged that the defendants constituted or formed a RICO “enterprise” within the meaning of 18 U.S.C. § 1961(4); that their actions were criminal offenses involving, inter alia, bankruptcy fraud, perjury, and bribery; that each of the offenses was a “racketeering activity” within the meaning of § 1961(1); that any two such offenses constituted a “pattern of racketeering activity” within the meaning of § 1961(5); that defendants’ formation, control, and conduct of the enterprise through their pattern of racketeering activity violated §§ 1962(a), (b), and (c); and that defendants’ conspiracy to do such acts violated § 1962(d). *515 Bankers demanded, inter alia, treble damages and attorney’s fees pursuant to civil RICO, § 1964(e). Defendants moved for judgment on the pleadings principally on the ground that the complaint was insufficient to state a claim under civil RICO.
In deciding the defendants’ motion, the district court stated that the facts alleged by Bankers “strongly suggest a sinister scheme to defraud the bank and other creditors of the monies they lent in good faith to BAC,” 566 F.Supp. at 1242, and that, “based solely upon the language of the statute, one could hardly contend that [Bankers] has not adequately alleged a violation of § 1962,” the criminal provisions of RICO, id. at 1239. The court concluded, however, that the complaint did not state a valid claim for relief under civil RICO. Construing § 1964(c)’s requirement that a civil plaintiff be injured “by reason of a violation of section 1962,” the court reasoned that to satisfy this requirement a civil plaintiff must “allege that he has suffered a distinct RICO injury as opposed merely to a direct injury from the underlying predicate acts.” 566 F.Supp. at 1240. Although finding it unnecessary to define what such “distinct RICO injury” would entail, the court opined that the provisions of civil RICO should be limited to the redress of “competitive injury” or “an injury to competition,” id. at 1241. Because Bankers’s complaint alleged only injury that was “a direct consequence of the predicate acts,” and not a “distinct RICO injury,” the district court dismissed the complaint. Id. at 1242. This appeal followed.
II. DISCUSSION
RICO’s provision for a private treble damage right of action reads as follows:
(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney’s fee.
18 U.S.C. § 1964(c). Section 1962 makes it unlawful, inter alia, (1) to invest income derived from a pattern of racketeering activity in any enterprise that is engaged in interstate commerce, § 1962(a); (2) to acquire or maintain control of such an enterprise through a pattern of racketeering activity, § 1962(b); (3) to participate in the conduct of such an enterprise’s affairs through a pattern of racketeering activity, § 1962(c); or (4) to conspire to do any of the above, § 1962(d).[3]
“[Enterprise” is defined to “include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.” 18 U.S.C. § 1961(4). “[Racketeering activity” is defined as an act or threat involving any of a number of specified felonies chargeable under state law or indictable under specified federal statutes (collectively “predicate acts”); bankruptcy fraud and bribery are included. § 1961(1). A “pattern of racketeering activity” is defined to “require[ ] at least two acts of racketeering activity” within a ten-year period. § 1961(5).
The focus of the present appeal is the meaning of § 1964(c)’s phrase “person injured in his business or property by reason of a violation of section 1962.” The phrase comprises three elements: injury to the plaintiff, causation of that injury, and the conduct that caused the injury. The first two elements present no problem in the instant case.
The requirement that the injury be to the plaintiff’s business or property means that the plaintiff must show a proprietary type of damage. For example, a person physically injured in a fire whose origin was arson is not given a right to recover for his personal injuries; damage to his business or his building is the type of injury for which § 1964(c) permits suit. *516 Bankers has alleged that it has been deprived of various sums of money by the defendants’ activities. There is no question that this constituted “injur[y] in [its] business or property,” and that Bankers has thus adequately pleaded an injury of the type contemplated by § 1964(c).
The requirement that the injury be “by reason of” a violation of § 1962 means that there must be a causal connection between the prohibited conduct and the plaintiff’s proprietary injury. Thus, it is insufficient for a plaintiff to prove simply a violation by the defendants and a proprietary injury; it must prove that the defendants’ violation caused the injury. There is no question in this case that Bankers has adequately alleged that its monetary losses occurred “by reason of” conduct of the defendants. The difficulty lies in the nature of the conduct that caused Bankers’s injury.
Section 1964(c) does not provide a private right of recovery unless the conduct that caused the injury was “a violation of section 1962.” We must therefore ask what conduct violates that section. Although, as detailed above, § 1962 has a number of facets, it is clear that it does not itself prohibit the predicate acts that constitute racketeering activity. Commission of two or more predicate acts is but an element of a § 1962 violation; those acts do not themselves constitute the § 1962 violation. Indeed, § 1962 does not even prohibit a pattern of racketeering activity, without more. Rather, there is a violation of § 1962 only if there are present both (1) the pattern of racketeering activity, and (2) the use of that pattern to invest in, control, or conduct, a RICO enterprise.[4] It is this confluence that constitutes the violation and, therefore, the confluence that must cause the proprietary injury.
The import of this analysis is that if a complaint alleges a proprietary injury that is caused by the defendant’s predicate acts, rather than by its use of a pattern of racketeering activity in connection with a RICO enterprise, the injury cannot be said to have been caused by “a violation of section 1962.” See Sedima, S.P.R.L. v. Imrex Co., 741 F.2d 482 at 494 (2d Cir.1984).[5] Accordingly, we agree with the conclusion of the district court that a civil RICO complaint must allege “a distinct RICO injury,” by which we mean that it must allege a proprietary injury caused by a RICO violation, not just one caused by some of the essential elements of a RICO violation.[6]
*517 We regard this as the plain meaning of § 1964(c), and we see no basis for inferring that Congress did not intend what it plainly-said. The legislative history of civil RICO has been exhaustively explored by this Court recently in Sedima, S.P.R.L. v. Im-rex Co., supra, 741 F.2d at 488-92, and we need not detail it here. Suffice it to say that the terms of § 1964(c) were not discussed at all in the Senate, whose final RICO bill did not contain a provision for a private right of action, and that the discussions in the House of Representatives centered almost entirely on the provision of civil remedies to be enforced by the government rather than by private parties. See id. at 490 & n. 24. As Sedima notes, the provision for a private treble damage action was added by a subcommittee of the House Judiciary Committee; when the Judiciary Committee reported the amended bill to the House, it did not mention the addition of this right of action. Id. at 489-490. In the House discussion of the bill, there was but one brief remark explaining the substance of the proposed amendment, as Congressman Poff, a member of the Judiciary Committee, noted that
at the suggestion of the gentleman from Arizona (Mr. Steiger) and also the American Bar Association and others, the committee has provided that private persons injured by reason of a violation of the title may recover treble damages in Federal courts — another example of the antitrust remedy being adapted for use against organized criminality.
116 Cong.Ree. 35,295 (1970). The remark fully supports our application of § 1964(c) according to its terms, since Congressman Poff spoke of recovery by persons injured by reason of “a violation of the title.”
Bankers argues that it is conceptually impossible to make any distinction between injury flowing from the predicate acts and
injury flowing from a pattern of racketeering activity, because a plaintiff injured by the predicate acts is ipso facto injured by the pattern. We disagree. If a plaintiffs injury is that caused by the predicate acts themselves, he is injured regardless of whether or not there is a pattern; hence he cannot be said to be injured by the pattern, and the pattern cannot be said to be the but-for cause of the injury. Further, we can envision a number of circumstances in which injury could be attributable to a pattern but not to the individual predicate acts. For example, a plaintiff who is victimized by a defendant enterprise’s multiple acts of arson may thereafter be denied fire insurance as a result of his fire history; such a plaintiff whose property subsequently suffers innocent fire damage would be unable to obtain reimbursement for the damage, and his monetary loss would be the result of the pattern of predicate acts of the enterprise, rather than any of the individual acts. Or, a plaintiff might be forced to incur an unwanted debt or to take on an unwanted business partner because an enterprise has placed his business in jeopardy by using felonious means to cause a number of his customers to withhold their custom. In each instance, the plaintiff would have suffered an injury to his business or property by reason of the defendants’ use of a RICO enterprise and a pattern of racketeering acts; the individual racketeering acts, however, could not be said to have caused the same injury.
In the present case, we agree with the district court that Bankers’s complaint did not allege a distinct RICO injury, i.e., an injury caused by a violation of § 1962, but only injuries caused by the individual predicate acts — or indeed, acts that are not specified as predicate acts under § 1961(1). Thus, Bankers’s loss of 83% of the debt *518 owed it by BAC was caused by the defendants’ bankruptcy fraud. That injury occurred in 1976 when BAC’s plan of arrangement was approved and BAC was discharged in bankruptcy.[7] The fact that later actions by the defendants may have prevented Bankers from remedying the injury caused it in 1976 does not mean that Bankers was injured by the “pattern” of the bankruptcy fraud and the later acts. Similarly, Bankers’s forced expenditures of legal fees in connection with frivolous and corruptly conducted lawsuits occurred as a result of the defendants’ distinct conduct in pursuing those lawsuits; Bankers’s expenses would have been incurred regardless of any other predicate acts performed by the defendants.
Since we cannot interpret Bankers’s complaint as alleging injury caused by the defendants’ violation of § 1962, we conclude that the district court properly dismissed the complaint.
CONCLUSION
The judgment of the district court is affirmed. No costs.
CARDAMONE, Circuit Judge, dissenting:
In 1970 Congress enacted the Organized Crime Control Act. Title IX of that Act, entitled Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. §§ 1961-1968 (1982), has stirred a storm of judicial controversy. The question before us on this appeal is whether its provisions mean what they say. Because in my view the majority holds that RICO means something other than what it says, I respectfully dissent. Reflection on RICO’s plain language, its legislative history and policy considerations convinces me that the majority has not accorded to civil RICO the broad sweep Congress intended it to have. Instead, the panel has succumbed to the temptation to put in place its own view of when this statute should be applied. But in so doing, it not only has pulled the teeth from the statute and reduced its effectiveness nearly to zero, but it has also trespassed in an area of law-making exclusively reserved to Congress. If civil RICO does not provide a remedy on the facts of this totally outrageous ease, it never will.
The majority opinion adequately details the facts alleged in the complaint. Bankers brings this RICO action based on the following predicate acts: fraudulent conveyance of the Brookfield Clothes stock to defendant Soifer in 1974 (bankruptcy fraud); false testimony in court in 1974 and 1976 regarding Braten Apparel’s assets, i.e., concealment of Brookfield as an asset (bankruptcy fraud); fraudulent concealment of Braten Apparel’s property from 1974 to present (bankruptcy fraud); bribery of a South Carolina state court judge by Rhoades (state law felony); Braten Apparel's transfer of Brookfield stock to Todd and Todd’s pledge of it to K.B. Business Credit to relieve the individual defendants of potential personal liability (bankruptcy fraud).
I LANGUAGE OF THE STATUTE
What did Congress have in mind when it enacted civil RICO? To determine the scope of Congress’ purpose in enacting a statute the first place to look, of course, is its language. It is a principle of statutory construction that “absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language,” United States v. Apfelbaum, 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980). It is there that the Supreme Court began its analysis of criminal RICO, United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), and that is where our *519 analysis of civil RICO should begin. North Dakota v. United States, 460 U.S. 300, 103 S.Ct. 1095, 1102-03, 75 L.Ed.2d 77 (1983); Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979).
Bankers Trust alleges that the individual and corporate defendants conducted an enterprise through a pattern of racketeering activity in violation of § 1962(c). That section provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of racketeering activity or collection of unlawful debt.
The word “enterprise” used in 1962(c) is defined in § 1961(5) as including “any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity.” The phrase “racketeering activity,” which is also part of § 1962(c), is defined in § 1961(1) as any one or more of some 24 acts indictable under state and federal law. These predicate acts include bankruptcy fraud and bribery “chargeable under State law and punishable by imprisonment for more than one year,” i.e., a state law felony. 18 U.S.C. § 1961(1)(A) & (D). Plainly, the statutory definitions for “enterprise” and the predicate offenses that are considered “racketeering activity” are met in this case. It is necessary next to examine what constitutes a “pattern of racketeering activity.” Section 1961(5) provides that such a pattern consists simply of at least two of the included predicate acts of racketeering occurring within ten years of one another. Finally, the statutory language for the relief Bankers seeks must be examined. The provision for treble damages is set forth in § 1964(c) which authorizes “(a)ny person” injured by a violation of § 1962 to sue and “recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney’s fee.” No limitation in the scope of this broadly worded section appears, and the words employed are not reasonably susceptible of a restrictive limitation.
In short, Bankers Trust has alleged that the individual defendants, Rhoades, Braten and Soifer, and the corporate defendants controlled by them, violated § 1962(c) by acting together as an enterprise to commit four acts of bankruptcy fraud and one act of bribery which is a state law felony, and that these acts occurred during the years 1974, 1976 and 1982 — the date of the last act being within ten years of the next most recent one. It has sued as a corporate person and demands treble damages and a reasonable attorney’s fee. Examining plaintiff’s complaint in light of the statutory language can lead to no other conclusion than that it alleges a civil cause of action under § 1964 of RICO. Such should be sufficient to withstand a Fed.R.Civ.P. 12(c) motion to dismiss on the pleadings.
II LEGISLATIVE HISTORY
Since the statutory language is conclusive absent clear evidence of a contrary legislative intent, see Iannelli v. United States, 420 U.S. 770, 786-89, 95 S.Ct. 1284, 1293-96, 43 L.Ed.2d 616 (1975), an analysis of RICO’s legislative history is appropriate.
A. National Crime Problem
Organized crime as a national problem is not new. Prohibition gave Mafia groups led by people like the notorious A1 Capone in the 1920s an opportunity to wield power in the underworld and make money through the sale of bootleg liquor. With prohibition’s repeal in 1933, the emphasis-shifted to other illegal rackets and to the “laundering” of “dirty” money gained from racketeering activities by investing it in legitimate businesses. The Kefauver Committee’s Hearings in the early 1950s, Special Committee to Investigate Organized Crime in Interstate Commerce, S.Rep. No. 307, 82d Cong., 1st Sess. 170 (1951), began to reveal the extent of the problem of organized crime to our national weal, and the November 14, 1957 meeting of *520 Mafia chieftains in Apalachin spotlighted it for the public. All of this is familiar history, and it was well known to Congress in 1970 as it was recited in one form or another in the hearings prior to RICO’s enactment. See generally Hearings Before Subcommittee No. 5 of the House Committee on the Judiciary, on S. 30 and Related Proposals, Relating to the Control of Organized Crime in the United States, 91st Cong., 2d Sess. (1970) (House Hearings); Hearings Before the Subcommittee on Criminal Laws and Procedure of the Senate Committee on the Judiciary, 91st Cong., 1st Sess. 61-62 (1969) (Senate Hearings); S.Rep. No. 617, 91st Cong. 1st Sess. 77-83 (1969) (Senate Report).
B. Congress Reacts to the Problem
The first legislative attempt to deal with the problem was Senator Hruska’s introduction in 1967 of S. 2048 and S. 2049, accompanied by a companion bill in the House of Representatives introduced by Congressman Poff. S. 2048, S. 2049, 90th Cong., 1st Sess. (1967). These bills focused on the “laundering” of “dirty” money derived from criminal activity. Neither bill was acted upon, in part because the American Bar Association thought that antitrust concepts, with their focus on maintaining competition, might be maladapted to the bill’s purposes. 115 Cong.Rec. 6994-95 (1969). Next, in January 1969 Senator McClellan introduced S.30, the Organized Crime Control Act, 91st Cong., 1st Sess. (1969), followed later that year by Senator Hruska’s introduction of S.1623 entitled the “Criminal Activities Profits Act,” a re-draft of his two earlier bills, which included a provision for treble damages. 115 Cong. .Rec. 6995-96 (1969). Later in 1969 Senators McClellan and Hruska jointly introduced S.1861, a bill styled as “The Corrupt Organizations Act.” It had no provision for private equitable relief or treble damages. Criticisms of this bill were leveled by the Department of Justice which thought the scope of predicate acts was too broad and that, were it adopted, it would effectively federalize criminal justice. See House Hearings at 329; Senate Hearings at 404-07.
Senator McClellan responded by stating that while the impetus for Congress to act arose from the revelations concerning “organized crime,” Congress as a legislative body had a duty to enact “comprehensive solutions” that need not be so limited. Further, he stated that it is impossible to draft a law that would effectively reach the commercial activities of organized crime and yet not reach offenses commonly committed by persons outside organized crime. 116 Cong.Rec. 18,913-14 (1970). Congressman Poff’s reply to the criticism that the bill did not contain a definition of organized crime was that had the bill included such a definition it would have been objectionable as “status based” legislation. 116 Cong.
From these beginnings Senator McClellan on December 18, 1969 amended his previously introduced S.30 to include S.1861 (the bill that he and Senator Hruska had jointly introduced) as Title IX of the Omnibus Crime Control Act of 1970. Title IX included bankruptcy fraud (which had been part of S.1623) and the amended text of Title IX was expanded to include mail fraud, wire fraud, and securities fraud. Senate Report at 21. Although the Senate Judiciary Committee reported favorably on S.30, Senators Hart and Kennedy believed the bill went too far and thought it should be restricted solely to “organized crime” activity. Senate Report at 215. Title IX, now entitled “Racketeer Influenced and Corrupt Organizations,” was passed by the Senate nearly unanimously (73 to 1) in January 1970 with Senator Hruska commenting that its principal value “may well be found ... in its civil provisions.” 116 Cong.Rec. 602 (1970). The bill was then sent to the House of Representatives. At the House Hearings the Association of the Bar of the City of New York appeared and argued, as had Senators Hart and Kennedy, that the bill went much too far inasmuch as its reach extended beyond organized crime. See House Hearings at 342, 370. Similar views were echoed by the American Civil Liberties Union, House Hearings at 490, 504, and Senator Young, 116 Cong.Rec. 852 (1970). *521 Ree. 35,204 (1970). In this connection, Congressman Biaggi later offered an amendment (it was not adopted) that would have explicitly prohibited membership in the Mafia. 116 Cong.Rec. 35,343. See House Hearings at 146. While S.30 was pending in the House, the ABA in July 1970 recommended several amendments, including a private right of action to obtain treble damages. House Hearings at 147,149, 543-44. During the debate, House Judiciary Chairman Cellar, speaking in support of the bill, specifically noted the treble damage provision authorizing suits by private parties. 116 Cong.Rec. 35,196 (1970). The bill passed the House by a lopsided margin. 116 Cong.Rec. 35,344 (1970). With the provision for treble damages and several other minor amendments now included, the bill returned to the Senate, where the motion to accept the House amendments was passed by voice vote. 116 Cong.Rec. at 36,296 (1970). The bill was signed into law by the President on October 15, 1970. 116 Cong.Rec. 37,264 (1970). The President had earlier indicated his support for civil remedies including treble damages in his message to Congress on Organized Crime. See Senate Hearings at 449-50.
C. Conclusions from Legislative History
Professor G. Robert Blakey, who served when these bills were processed as Chief Counsel of the Senate Subcommittee on Criminal Laws and Procedures, has summarized Congress’ purposes in the passage of S.30: (1) RICO was fully intended to apply beyond organized crime; (2) it was deliberately redrafted so as not to be limited by anti-trust concepts like “competitive” or “commercial injury;” (3) immediate victims of racketeering activity and competing organizations were contemplated as civil plaintiffs for treble damages; (4) federalizing criminal justice was something of which Congress was well aware when it extended the predicate offenses to wire, mail and securities fraud; (5) Congress was also well aware that it was creating new federal remedies — civil and criminal — for acts traditionally viewed as common law fraud. G. Blakey, The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg, 58 Notre Dame L.Rev. 237, 280 (1982).
The legislative history further reveals that Congress had fairly detailed information about what was styled a national criminal syndicate known as La Cosa Nostra, a confederation of 24 families consisting of some 5000 individuals. Senate Report at 76-83. But as Senator McClellan noted it is sometimes hard “to tell what is or is not organized crime.” House Hearings at 129. And the franchise of organized crime is not one that belongs solely to one ethnic group of Americans, as this case illustrates. “Organized criminals who injure business today do not look like stereotyped criminals. They are executives and technicians. Their forte is manipulation of computer information, tampering with accounting procedures, theft of trade secrets and invasion of confidential company files.” House Hearings at 689. Congress determined therefore not to attack a group of persons or any single organization, but to proscribe broadly those kinds of activities which are at the root of business crime. Congress passed this statute, called an “omnibus” act, to purge society of commercial organized criminal activities regardless of the group perpetrating them. Because the disease is long standing and deeply entrenched, the treatment employed radical new civil remedies, including treble damages, award of attorneys fees, injunction, forfeiture, divestment of interests and dissolution of corporations. For good measure Congress incorporated in § 904(a) of the statute a command to the judiciary that the statute be liberally construed to effectuate its remedial purposes. Pub.L. No. 91-452, § 904(a), 84 Stat. 941 (1970). Since Senator Hruska had included a treble damage provision in earlier versions of RICO, it is apparent that RICO’s sponsors in the Senate were fully familiar with the implications of such a private remedy.
That the foregoing was the aim of the statute’s principal sponsors, Senators McClellan and Hruska and Congressman Poff, a majority of the Judiciary Committees of both Houses, its overwhelming sup *522 porters in both Houses, and the President is beyond serious question. Such view of Congress’ aim is shared by a number of commentators. See, e.g., G. Blakey, RICO Civil Fraud, supra; J. Wexler, Civil RICO Comes of Age: Some Maturation Problems and Proposals for Reform, 35 Rutgers L.Rev. 285 (1983); Note, Civil RICO: The Temptation and Impropriety of Judicial Restriction, 95 Harv.L.Rev. 1101 (1982). The answer to the question as to whether the legislative history evinces a legislative intent contrary to the plain language of the statute then must be a resounding “no.”
Ill ANALYSIS OF MAJORITY’S HOLDING
The fallaciousness of the district court’s opinion and the majority view is demonstrated by analyzing them in the light of the statute’s plain language and legislative history. The majority gives its imprimatur to the district court’s view that in an ordinary case of bankruptcy fraud civil RICO was not intended to apply. The complaint was dismissed below because Bankers had not been damaged “by reason of” a RICO violation. A number of other courts have sought to thwart RICO’s far-ranging impact by requiring “something more” than injury from the predicate acts, i.e. something beyond what the statute and its history require, such as a nexus with organized crime, Moss v. Morgan Stanley, Inc., 553 F.Supp. 1347, 1361 (S.D.N.Y.), aff'd on other grounds, 719 F.2d 5 (2d Cir.1983), cert. denied, — U.S. -, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), prior criminal conviction or indictment, Sedima S.P.R.L. v. Imrex Co., 741 F.2d 482, (2d Cir.1984), or a competitive injury, North Barrington Dev., Inc. v. Fanslow, 547 F.Supp. 207, 211 (N.D.Ill.1980).
Interpreting civil RICO as requiring “something more” than injury from the predicate offenses, the majority has thus adopted one variant of the “racketeering enterprise injury” standing requirement. For the most part those cases that have upheld civil RICO claims have noted without extensive discussion that any such requirement was satisfied, see, e.g., Schacht v. Brown, 711 F.2d 1343, 1358-59 (7th Cir.), cert, denied, — U.S.-, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983). Similarly, decisions like that of the trial court here which have dismissed RICO claims on this ground have not defined the enterprise injury requirement. See, e.g., Johnsen v. Rogers, 551 F.Supp. 281, 284-85 (C.D.Cal.1982).
Here, the panel furnishes examples of a “racketeering enterprise injury,” something earlier cases have failed to do. The first example given is that of an arson victim who subsequently suffers innocent fire damage that goes unreimbursed. The second involves a businessman forced to incur unwanted debts or to take on unwanted partners because an enterprise has felo-niously caused his customers to “withhold their custom.” These examples, far from clarifying the racketeering injury requirement, underscore the difficulty of defining its contours. In both examples, the only victims entitled to recover under civil RICO would be those whose injuries are caused indirectly. In both instances, the injuries directly caused by the admittedly “felonious” acts of a RICO defendant (even a member of La Cosa Nostra) would not be subject to the civil sanctions Congress specifically enumerated. The majority’s approach thus nullifies § 1964 even in the case of Mafia defendants, the motivating reason for Congressional action in this area. Stated another way, even a convicted Mafia defendant could escape civil liability for the harm done his intended victim under the majority’s reasoning.[1]
*523 Thus, unlike the “racketeering enterprise injury” test that focuses on the “by reason of” language, cf. Sedima S.P.R.L. v. Imrex Co., supra, 741 F.2d at 494 that arguably seems to require a link to organized crime, see id., at 509 (Cardamone, J., dissenting), the majority’s approach here creates the risk that even Mafia defendants will not be subject to the civil liability that Congress so clearly envisioned. For this reason, and because the requirement is generally undefined, a host of recent decisions have rejected the racketeering enterprise injury requirement. See, e.g., Kirschner v. Cable/Tel Corp., 576 F.Supp. 234, 244 (E.D.Pa.1983) (racketeering enterprise injury requirement has been “uniformly rejected” as contrary to statutory language and legislative intent); Ralston v. Capper, 569 F.Supp. 1575, 1580 (E.D.Mich.1983) (racketeering enterprise injury requirement “undefined”); Mauriber v. Shearson/ American Express, Inc., 567 F.Supp. 1231, 1240 (S.D.N.Y.1983) (racketeering injury has no basis in language of statute or legislative history and would exclude from section 1964 even the conduct of a firm infiltrated by organized crime); Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 567 F.Supp. 1146, 1157 (D.N.J.1983) (“this judicially imposed requirement of a ‘racketeering enterprise injury’ seems artificial and unwarranted by the language of the RICO statute.”); Kimmel v. Peterson, 565 F.Supp 476, 493-95 (E.D.Pa.1983) (racketeering enterprise injury is indistinguishable from competitive or commercial injury requirement and would allow certain targeted behavior to escape section 1964’s reach). See also Alcorn County, Miss. v. U.S. Interstate Supplies, 731 F.2d 1160, 1169 (5th Cir.1984); Sutliff Inc. v. Donovan Companies, Inc., 727 F.2d 648, 653-54 (7th Cir.1984); Bennett v. Berg, 685 F.2d 1053, 1059 n. 5 (8th Cir.1982), aff'd in part on rehearing en banc, 710 F.2d 1361, cert, denied,_U.S. _, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983) (implicitly rejecting racketeering enterprise injury requirement).
IV REASONS FOR DISAGREEMENT WITH MAJORITY
I fail to see how the complaint lacks any element required by the statute. In my view the complaint sufficiently alleges that Rhodes, Braten and Soifer conducted their crooked corporate “shell game” through a pattern of racketeering activity by way of bankruptcy fraud and state law felonies. It is claimed in the complaint that the RICO enterprise operated by these three and their companies in a continuing pattern of racketeering activity was conducted through conspiracy and fraud, each element of which has contributed to the overall injury — loss to Bankers of some $4 million plus substantial legal fees. These allegations track the plain language of the statute. Moreover, this is not an ordinary “garden variety” bankruptcy fraud since defendants’ acts occurred over a nine year period in two different states and involved not only fraud, but frivolous litigation, bribery and corruption of state court judges. Only a semantical — not a practical — reading of Bankers’ complaint could conclude otherwise. Thus, Bankers has alleged every element § 1964 requires. See Beth Israel Medical Center v. Smith, 576 F.Supp. 1061, 1070 (S.D.N.Y.1983).
Further, the majority’s reading of civil RICO is contrary to its legislative history. According to the legislative history “it is the factor of continuity plus relationship which combines to produce a pattern.” S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969). While proof is required of an enterprise and a pattern, we have held that the proof need not be distinct as to each, “as long as the proof offered is sufficient to
*524 satisfy both elements.” United States v. Mazzei, 700 F.2d 85, 89 (2d Cir.), cert, denied, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983). Two acts in the same criminal episode may establish a pattern of racketeering. United States v. Parness, 503 F.2d 430, 441-42 (2d Cir.1974), cert, denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). In addition to the pattern there must be the requisite connection with the enterprise. We have already spoken on how close that nexus must be by holding that one conducts the activities of an enterprise through a pattern of racketeering activity when he is able to commit predicate offenses solely by virtue of his position, involvement or control over the enterprises’ affairs or where the predicate acts are related to the activities of the enterprise. United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980), cert, denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Here that nexus is shown by both tests since the individual defendants controlled the corporate entities and the fraud and crimes were clearly part and parcel of the way the enterprise was run. Plainly, these acts are the type of commercial activity that Senator McClellan recognized would be caught in the statute’s wide net. 116 Cong.Rec. 18,913-14.
The majority has simply amended RICO by adding this standing requirement that Congress did not include and which it readily could have included had it so desired. Adding restrictions to defeat the broad remedies of civil RICO seems a particularly unjustified exercise of judicial power when the same text is interpreted to require none of these same restrictions in criminal cases. Finally, the majority’s restrictive reading was thoroughly aired in the extensive Congressional hearings and later rejected when Congress considered those disagreements and resolved them in the bill it enacted into law. By judicially enacting the view that did not carry the day, the majority involves itself in those political controversies appropriate in a bill’s enactment, but that have no place in its judicial interpretation. See Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 393-95, 71 S.Ct. 745, 750-51, 95 L.Ed. 1035 (1951) (Jackson, J., concurring). As another panel of our Court stated recently in Aetna Cas. and Sur. Co. v. Liebowitz, 730 F.2d 905, 909 (2d Cir.1984): “We are bound by the legislative intent that existed when RICO was passed. Congress is free to change that law if it desires.”
For these reasons I dissent and vote to reverse the judgment dismissing Bankers Trust’s complaint and remand the case to the district court for trial.

. Feldesman was originally named as a defendant, but by stipulation the complaint against him was dismissed.

. Section 386 of the Bankruptcy Act provided that a bankruptcy court could set aside its confirmation of a debtor’s plan of arrangement
[i]f, upon the application of parties in interest filed at any time within six months after an arrangement has been confirmed, it shall be made to appear that fraud was practiced in the procuring of such arrangement and that knowledge of such fraud has come to the petitioners since the confirmation of such ar-rangement____
11 U.S.C. § 786 (1976).

. Section 1962 also prohibits actions to invest in, control, or participate in such an enterprise through the “collection of an unlawful debt." Such collection activities are not at issue here and are not intended to be dealt with in our discussion of other aspects of § 1962.

. See note 3, supra.

. As an alternative ground, the Sedima panel also ruled that a plaintiff may not prevail in a civil RICO suit without establishing criminal convictions of the defendant on the underlying predicate acts or a conviction under RICO itself. We need not reach this issue in light of our conclusion that the conduct that caused Bankers's injury did not constitute a violation of § 1962.

. We do not agree with the view that, because the structure of § 1964(c) was patterned after § 4 of the Clayton Act, 15 U.S.C. § 15 (1982), which grants a private right of action under the antitrust laws, see, e.g., Sedima S.P.R.L. v. Imrex Co., supra, at 494; In re Action Industries Tender Offer, 572 F.Supp. 846, 851-52 (E.D.Va. 1983); Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts — Criminal and Civil Remedies, 53 Temple L.Q. 1009, 1040, 1042 (1980), a civil RICO plaintiff is required to show a "competitive injury" or "injury to competition.” See Bankers Trust Co. v. Feldesman, supra, 566 F.Supp. at 1241; North Barrington Development, Inc. v. Fanslow, 547 F.Supp. 207, 210-11 (N.D.ill.1980). Although in enacting RICO Congress made an express finding that organized crime "interfere^] with free enterprise," Pub.L. No. 91-452, 84 Stat. 922, 923 (1970) (Statement of Findings and Purpose), and the major purpose of Congress’s enactment of RICO was to address the infiltration of organized crime into legitimate business and to protect free and fair enterprise, the objectives of RICO go beyond the objectives of the antitrust laws. Congress was concerned as well with the effects of organized crime upon democratic processes, innocent investors, domestic security, and the general welfare of the United States and its citizens. See id.; S.Rep. No. 617, 91st Cong., 1st Sess. 81-82 (1969). The language used in § 1964(c), "injured in his business or property,” is unaccompanied by any other restrictions as to type of injury, and hence is broad enough to encompass private proprietary injury that has no impact on the plaintiff's ability to compete or on competition as such. We see no basis in the *517 statute for importing the antitrust concepts. Indeed, as set forth in Sedima S.P.R.L. v. Imrex Co., supra, 741 F.2d at 495, the legislative history of civil RICO suggests that Congress did not intend § 1964(c) to be fettered by antitrust concepts. See, e.g., S.Rep. No. 617, 91st Cong., 1st Sess. 81-82 (1969); 115 Cong.Rec. 9567 (1969) (statement of Senator McClellan); id. at 6992-93 (statement of Senator Hruska); Hearings on S. 30, and Related Proposals, Relating to the Control of Organized Crime in the United States, Before Subcomm. No. 5 of the House Comm, on the Judiciary, 91st Cong., 2d Sess. 149 (1970) (statement of the Antitrust Section of the American Bar Association); id. at 157 (statement of Attorney General Mitchell).

. It would of course be possible to fragment virtually any fraudulent scheme and characterize phases of the scheme as violations of various laws (e.g., conspiracy to defraud, fraudulent representations, fraudulent use of the mails, etc.). The matter of whether given conduct should be considered one or more than one "predicate act” is a matter best left, in the first instance, to the discretion of the district judge. See, e.g., Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities," 18 Ga.L.Rev. 43, 66 (1983).

. Further analysis of the majority’s examples demonstrates their shortcomings. The arson victim, for example, would have a valid RICO cause of action only because, fortuitously, he had an insurer who cancelled his policy. Similarly, the businessman could sue under § 1964 only because he was forced to incur a debt to or associate with some third party. Congress did not intend § 1964's availability to turn on the victim’s specific situation or conduct. Rather, the statute is aimed at a defendant's conduct. Suppose, for example, that a member of the Mafia engages in loansharking activity over a ten year period but never forces his victim into *523 dealing with a third party. Even if this member of organized crime were convicted in federal court under RICO’s criminal provisions, e.g., United States v. Riccobene, 709 F.2d 214 (3d Cir.), cert, denied, — U.S.-, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), the victim would not have a civil RICO claim under the majority's analysis. In this more likely example, the defendant’s conduct not only would have caused the plaintiff’s injury but is of the specific type Congress sought to give a remedy for when it enacted civil RICO.