**SPINELLI, KEHIAYAN–BERKMAN, S.A.**

v.

**IMAS GRUNER, A.I.A., & ASSOCIATES, et al.**

**Civ. No. Y–84–1116.**

United States District Court, D. Maryland.

Feb. 13, 1985.

Robert J. Beagan and Jeffrey G. Gilmore, Vienna, Va., and Gerald O'Brien, Rockville, Md., for plaintiff.

Stephen Leventhal, Bethesda, Md., for defendants.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

### I. BACKGROUND

This action was instituted by Robert O. Spinelli ("Spinelli") and Spinelli, Kehiayan-Berkman, S.A. ("SKB"), an Argentinian corporation against defendants Lelia Imas Gruner, Juan Gruner, Imas Gruner, A.I.A., and Associates ("AIA"), a Maryland partnership. The suit arises out of a series of partnership and real estate ventures entered into by the parties in mid 1980 and continuing through 1983. These transactions involved four properties and a $100,000 loan made to defendants Juan and Lelia Gruner by SKB. The properties include:

1) 2101 F. Street, N.W.;

2) Silver Spring Business Center;

3) 1224 Thirteenth Street, N.W.; and

4) Strathmore Apartments.

In their amended complaint, plaintiffs allege that SKB and AIA executed a partnership agreement on July 17, 1981, forming a general partnership known as the Five Seasons Partnership ("the partnership"). Count I of the amended complaint alleges that AIA (IGA in the amended complaint) and Juan Gruner, as managing partners of the partnership, owed a fiduciary duty to the plaintiff (general partners) and that the defendant managing partners breached this fiduciary duty and their statutory duty to make partnership records available. Count II alleges that defendants misappropriated partnership funds and directed plaintiff's share of the profits and proceeds from the sale of the Silver Spring Business Center (partnership property) for uses unknown to the plaintiffs. The net profit of $486,818.00 from this sale as well as $33,638.00 in additional interest income was to be equally divided between plaintiffs and defendants, inasmuch as each maintained a 50% interest in the partnership under the partnership agreement. Count II also alleges that defendants were to pay plaintiffs $180,000 to acquire plaintiff's interest in the 2101 F. Street partnership and $100,000 in satisfaction of a loan plaintiff SKB

had made to defendants earlier. Plaintiffs allege in Count II that nine checks numbered 481–490 and submitted by defendants to plaintiffs in satisfaction of $406,500.00 of the alleged outstanding debt were returned because of insufficient funds, and that the monies represented by these checks were directed and otherwise misappropriated by defendants.

Count III of the amended complaint seeks dissolution of the partnership and an audit and accounting of all partnership transactions, books, and records. Plaintiffs allege that all demands concerning the request for an audit and accounting have been refused or ignored by the defendants.

Count IV of the amended complaint, based on the Federal RICO Statute, 18 U.S.C. § 1961–68, was dismissed by plaintiffs prior to trial.

Finally, Count V, alleging mail fraud under 18 U.S.C. § 1341 as the predicate act necessary to obtain relief under RICO, was dismissed prior to trial for reasons stated herein.

Defendants reject plaintiff's contentions in Count I of the amended complaint alleging a breach of a fiduciary and statutory duty and argue that the partnership was under the joint management of both Messrs. Gruner and Spinelli to enable each to protect the interest of their respective constituents. Defendants allege that they performed all duties owed to the plaintiffs and made full disclosure to them, either directly or through Spinelli, of facts known to the defendants which related to the partnership business. Defendants also contend that the partnerships' books were not kept current and that all parties were aware of that fact. Finally, defendants insist that it was Spinelli's responsibility to keep SKB informed and that he failed to do so.

Defendants also deny any misappropriation of funds relating to the Silver Spring Business Center as alleged by plaintiffs in Count II of the amended complaint. They contend that any funds received by or on behalf of the partnership for the sale of the Silver Spring Business Center are the sub-

ject of an accounting and have yet to be stated with any specificity. They also argue that these funds did not constitute profit alone as the partnership has and had significant debts. They do admit commingling partnership funds in one or more of the defendants' accounts but contend that it was done with the consent of the plaintiffs. Defendants indicate that this commingling resulted from a difficulty in accounting for the use of all the funds initially, but that the funds have now been accounted for.

Defendants also deny the allegations of Count III of the amended complaint and insist that the plaintiffs have never been denied an accounting or audit and argue that the plaintiffs have never undertaken such an accounting or audit on their own and that the partnership was, and is without funds to pay for an accounting. Defendants also object to the plaintiffs' persistent efforts to have a receiver appointed on the grounds that it is an unnecessary expense in light of the fact that the defendants are agreeable to permitting the plaintiffs to operate the partnership if they will post a security bond as they are not American citizens and have substantial interests and residences abroad.

Defendants offer the following legal theories as a basis for resisting and responding to plaintiffs' claims for relief in Counts I–III of the amended complaint.

*Legal Theories*

1. No breach of duty existed.
2. The doctrine of laches bars equitable relief.
3. The Statute of Limitations bars legal and equitable remedies.
4. Unless set aside as prayed for in the counterclaim, the October 14, 1983 agreement represented an accord and satisfaction settling all disputes through that date.
5. Plaintiffs have waived their right to complain because, their agent, Spinelli, did not act to direct the maintenance of records to their satisfaction and concealed or failed to reveal information concerning the partnership to the plaintiffs.
6. Spinelli's failure to participate in the partnership as agreed has created in whole or in part any problems which plaintiffs perceive.
7. There is want of a necessary party, Ricardo Kehiayan.
8. The plaintiffs have failed to state a claim upon which relief may be granted.

## II. ANALYSIS

### A.

Under Maryland's statute of limitations, civil actions may be filed within three years of the accrual of a cause of action. Md.Ann.Code Maryland Courts and Judicial Proceedings § 5–101 (1984). A cause of action does not accrue until a claimant knows or should reasonably know of the existence of his claim. *See Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981). Moreover, where a fiduciary duty or relationship exists between the plaintiff and defendant, the failure to use due diligence in discovering the claim may be excused. *See Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 339 A.2d 664 (1975). Therefore, defendants' theory involving the statute of limitations as a defense has no merit. This suit was filed on March 21, 1984, and the transactions which are the subject matter of this litigation and which give rise to the causes of action pursued here occurred between October, 1981, and February, 1984, well within the three-year limitations period. Moreover, had any transaction occurred earlier, the causes of action arising therefrom would not have accrued for limitations purpose while the partnership continued and a fiduciary duty was owed to the plaintiff by the defendants.

Defendants do not contest the fact that in an accounting, the plaintiffs are entitled to a credit of $180,000 for the purchase price on the F. Street property and the

repayment of the $100,000 loan made to defendants by SKB.

B.

■ In addressing Count V, the Court notes that the plaintiffs seek treble damages, costs, and attorneys fees pursuant to § 1964 of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, alleging mail fraud, 18 U.S.C. § 1341, and state felony bad check, Md.Ann.Code 27 § 142 as the requisite predicate acts necessary to establish a "pattern of racketeering activity" under the RICO statute. This is not a proper case to invoke the civil remedies available under RICO. There are numerous grounds for attacking the RICO count under the facts of this case. Moreover, it is apparent that Congress did not intend that RICO should apply to private plaintiffs who seek to prosecute every garden variety fraud or contract violation. *See Sedima, S.P.R.L. v. IMREX*, 741 F.2d 482, 503 (2d Cir.1984); *Furman v. Cirrito*, 741 F.2d 524, 528–29 (2d Cir.1984).

■ Although there is no unanimity among various federal courts on this point, these Second Circuit cases state clearly that, before a private civil action may be maintained under RICO, there must be a violation, "that is, criminal convictions on the underlying predicate offenses" which form the pattern of racketeering activity

that the RICO statute is intended to address. *Sedima*, 741 F.2d at 503; *see generally, Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 516, n. 5 (2d Cir.1984) (recognizing the criminal convictions requirement enunciated by the *Sedima* panel); *Furman*, 741 F.2d at 526 (same); *contra, e.g., USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 95, n. 1 (6th Cir.1982) (nothing in the plain language of RICO to suggest that civil liability under § 1964 is limited only to those already convicted or charged with criminal racketeering activity) (other citations omitted).*

■ There is sound justification for this criminal conviction requirement. As the *Sedima* court reasoned, RICO civil liability simply does not exist without criminal conduct, *Sedima*, 741 F.2d at 501; *see U.S. v. Campanale*, 518 F.2d 352, 365, n. 36 (9th Cir.1975) ("[t]he acts constituting racketeering activity must themselves be criminal offenses"), although in a criminal RICO case the proof of the predicate act convictions may be made under the same indictment, "in the same trial and coordinately with the proof of the RICO offenses." However, in a civil context, there is no way to know whether the conduct in question is "already criminal," a problem which is compounded by the fact that ordinarily there is a lower burden of proof in civil actions. *Sedima*, 741 F.2d at 501.[1]

* The Court is aware of *Battlefield Builders, Inc. v. Swango, et al.*, 743 F.2d 1060, 1063 (4th Cir. 1984), in which the Fourth Circuit noted that a pattern of racketeering activity as contemplated by the RICO statute is established by the plaintiff's allegation that the defendants were guilty of both extortion and attempted extortion. However, the precedential value of *Battlefield* is expressly limited by the court's statement that its interpretation was "for the purposes of [the case before it]." *Id.* at 1063. The resolution of that case necessarily embodied a determination that an allegation of two or more predicate acts attributable to the defendants was sufficient to maintain a RICO claim, and thus, the court's finding on this issue is not dictum in a strict sense. However, the qualifying language in the opinion indicates that the determination need not be applied wholesale nor need it control the resolution of the case before this Court. This view is particularly appropriate in light of the fact that the opinion in *Battlefield* does not

explore or address in a substantial way the question of whether a mere allegation of the requisite predicate acts is sufficient to maintain a RICO claim or whether a prior indictment or conviction is a prerequisite to establishing a viable civil claim under the RICO statute.

1. This problem, of course, relates to the burden which a plaintiff must carry to prove that a defendant is a "racketeer," because he has committed at least two predicate acts. At least three different standards of proof are within the realm of possibility: proof beyond a reasonable doubt, proof by clear and convincing evidence, and proof by a preponderance of evidence. "Courts in addition have indicated that probable cause must be alleged with reference to the predicate acts, although how this is meant to relate to the burden of proof of the plaintiff at trial remains something of a mystery." *Sedima, supra,* at 501 (citations to cases suggesting the above are omitted).

Insofar as the RICO scheme calls for only criminal conduct to be punished, it thus appears that in the absence of previous convictions a civil plaintiff must carry a burden equal to that in a criminal case in proving that criminal conduct. Yet it would be extraordinarily difficult for juries to understand the different burdens of proof· required for different elements of a civil case. Moreover, if Congress had intended to impose such an unusual scheme, one would think that some suggestion of it would have occurred in the extensive legislative history. Instead, that history indicates that Congress assumed a preponderance standard was appropriate. The most logical conclusion to be drawn is that Congress expected the criminality of the predicate acts to be proven before the private action went forward—that a criminal conviction must precede a private civil suit. *Sedima*, 741 F.2d at 501–02.

In addition to burden of proof problems, civil RICO claims without criminal convictions would frequently be unfruitful as it is unlikely that such private RICO actions would progress very far, since defendants may block discovery by invoking the Fifth Amendment where a criminal prosecution is possible. *Sedima*, 741 F.2d at 503; *see* Bridges, Private RICO Litigation Based on *"Fraud in the Sale of Securities,"* 18 *Ga. L.Rev.* 43, 46 n. 20 (1983).

Finally, the Second Circuit has given a particularly plausible reading of the words "indictable" and "chargeable" found in RICO's definitional section, 18 U.S.C. § 1961(1), which suggests that Congress did not intend to give civil courts power to determine whether an act is "indictable" in the absence of a properly returned indictment or "chargeable" absent an information. "Courts do not traditionally look at a given set of facts—proved by a preponderance of evidence only—and say that these facts make out acts which are 'indictable' or 'chargeable.'" *Sedina*, 741 F.2d at 500, citing *Kleiner v. First National Bank of Atlanta*, 526 F.Supp. 1019, 1022 (N.D.Ga. 1981), *overruled on other grounds sub nom. Morosani v. First National Bank of Atlanta*, 703 F.2d 1220 (11th Cir.1983). Indictments are the exclusive province of grand juries. The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury ...," and "being declared a 'racketeer' or held responsible for being one is being held to 'answer for' an 'infamous crime.'" *Id.* Thus, under the interpretation given RICO by those courts which do not require criminal convictions of the predicate acts before commencement of a civil action, "every private plaintiff becomes his own one person grand jury, or in the case of state felonies chargeable by information, his own prosecutor." *Id.* This Court does not adopt this interpretation of the RICO statute and thereby avoids the attendant anomalistic results.

The Court is not aware of any convictions of the defendants for the predicate acts of mail fraud and felony bad check. Accordingly, Count V of the amended complaint is dismissed.

C.

Spinelli and Juan Gruner, both native Argentinians and architects, first met in 1974 and thereafter entered into four basic real estate transactions with varying degrees of success. Plaintiffs now seek money damages on each of these transactions.

### 2101 F. Street

Plaintiffs were not satisfied with the progress of this project and entered into an agreement with defendants that required defendants to repay plaintiffs' capital contribution of $180,000 with interest at 12% per annum from November 3, 1982. Although the property was sold by defendants on February 11, 1984, no payment has been made under this agreement. Judgment will be entered for $180,000 with interest at 12% from November 3, 1982.

### Silver Spring Business Center

Plaintiffs and defendants formed the Five Seasons Partnership in 1981. Under the terms of the partnership agreement

signed July 17, 1981, plaintiffs agreed to pay $500,000 for a 50% interest and defendants contribution in facilities, materials, goods and services, research, development and professional expertise was valued at $500,000 and received a 50% interest. Thereafter, plaintiffs contributed an additional $279,500.

The Silver Spring Business Center was later sold for $1,850,000 to Coldspring Associates. Unknown to the plaintiffs, defendants also received a 29% interest in Coldspring for which they paid nothing, alleging the interest was given to them in exchange for certain services. The Court finds this interest should be added to the sale price which then becomes $2,605,634.[2] The defendants provided no credible evidence to justify the theory that the 29% interest was in exchange for defendants' contribution to Coldspring Associates. In any event, secret dealing between defendants and Coldspring would result in a clear breach of defendants' obligations to plaintiff under their partnership agreement.

Judgment will, therefore, be entered in favor of plaintiffs in the amount of $1,582,317 as a result of the sale of the Silver Spring Business Center with interest at 12% from April 15, 1982.[3]

### 1224 13th Street

Plaintiffs allege that this property located in the District of Columbia was acquired with funds from the Five Seasons Partnership and they should receive one-half of the value of the property. Although defendants' conduct in all of these transactions make this a possible inference, it is no more than that, and plaintiffs have failed to carry their burden to prove the source of funds used to acquire this property.

### Strathmore Apartments

The Five Seasons Partnership entered into an agreement with others, forming the Strathmore Limited Partnership. The details of the financing of that partnership and its subsequent activities were not fully developed at trial. However, all parties apparently agree that this partnership should be timely dissolved. Until a sale can be negotiated and a proper accounting made between the parties, the defendants will be relieved of any management responsibility and the management of the Strathmore Limited Partnership will be turned over to plaintiffs.

### Loan

On April 24, 1983, plaintiffs loaned defendants the sum of $100,000. The debt was to be paid with interest at 12% from November 2, 1982. The loan has not been paid and defendants agree that judgment should be entered for this amount.

Accordingly, judgment will be entered in favor of plaintiffs against defendants in the amount of $100,000 with interest at 12% from November 2, 1982.

Defendants filed a counterclaim against plaintiffs seeking rescission of an agreement dated October 14, 1983, and a third-party complaint against Robert Spinelli and Jaime Berkman, the S and B respectively in the partnership SKB. This complaint alleges that if defendants are liable to plaintiffs, then the third party defendants are liable to defendants in a similar amount. The theory of this claim is that defendants relied upon the advice of Spinelli and Berkman and therefore they should be equally responsible to any claims.

This claim is so disingenuous that it requires little comment. This case is replete with evidence that defendants did what they wanted to do and consulted with plaintiffs only when necessary. The funds of the partnership were, on occasion, commin-

---

2. Under the facts, the contract price was for $1,850,000 representing 71% of the total sale price. The defendants retained a 29% interest in the Coldspring venture. The selling price for 100% interest was $2,605,634. The parties have yet to provide the Court with the value of

Coldspring, therefore, this method of calculation is a viable alternative.

3. The total sale price was $2,605,634. Plaintiffs' interest was 50% or $1,302,817 plus the additional contribution of $279,500.

gled with their personal funds. Accordingly, judgment on both claims will be entered in favor of the counter-defendants and third-party defendants.

The findings of fact and conclusion of law made herein are in accordance with the provisions of Rule 52, Federal Rules of Civil Procedure, whether or not so specifically identified.