**W. Larry HUNT as Receiver of Life Insurance Company of America, an Alabama corporation, Plaintiff,**

v.

**AMERICAN BANK & TRUST COMPANY OF BATON ROUGE, LOUISIANA, a banking corporation; Calvin Wilson; Rolf McCollister; George E. McNutt, Jr.; Robert A. Holloway; Donald A. Hayden; Donald E. Hinds; George Pihakis; Karl Rodriquez; Jack R. Tanner; Matthew E. Wright; James Pihakis; Benjamin E. Abbott, Jr.; John C. Roth; Don L. Atkins; Sam A. Gallo; each individually and as, or as former directors of Royal American Corporation and/or Pacific American Corporation, and/or Life Insurance Company of America and/or Investors Corporation of America and/or American Bank and Trust Company of Baton Rouge, Louisiana, Defendants.**

No. CV81–H–601–S.

United States District Court, N.D. Alabama, S.D.

April 10, 1985.

---

John N. Pappanastos, Pappanastos & Blanchard, P.C., Montgomery, Ala., J. Gusty Yearout, Joanne Boyd, Yearout, Hardy & Myers, P.C., Birmingham, Ala., for plaintiffs.

Calvin W. Wilson, Pensacola, Fla., W. Ramsey McKinney, Jr., Caine O'Rear, Alex F. Lankford, Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for American Bank & Trust.

Jack E. Held, C. Lee Reeves, Sirote, Permutt, Friend, Friedman, Held & Apolinsky, P.A., Birmingham, Ala., for Matthew E. Wright.

Donald E. Hinds, pro se.

James Pihakis, pro se.

Clarence M. Small, Jr., Karen Bowdre, Rives, Peterson, Pettus, Conway, Elliott & Small, Birmingham, Ala., for McCollister, McNutt, Holloway, Hayden, Rodriquez and Gallo.

Ferris S. Ritchey, Jr., Birmingham, Ala., for George Pihakis.

## MEMORANDUM OF DECISION

HANCOCK, District Judge.

This cause comes before the court on the June 23, 1983 motion for summary judgment of defendant American Bank & Trust Company of Baton Rouge, Louisiana, (American Bank) and the June 28, 1983 motion for summary judgment of defendants Rolfe H. McCollister, George E. McNutt, Jr., Robert A. Holloway, Donald A. Hayden, Karl E. Rodriguez, and Sam Gallo (the "moving individual defendants") which two motions for summary judgment are addressed to the First, Second, Third and Fourth causes of action set forth in the complaint, as amended August 7, 1981 and as amended March 18, 1983. This cause is also before the court on the January 14, 1985 motions to dismiss of American Bank, the moving individual defendants and defendant Calvin Wilson directed to the Fifth, Sixth, Seventh, Eighth, Ninth and Tenth causes of action set out in the third, fourth and fifth amendments to the complaint. The issues raised by the motions have been ably presently to the court by excellent briefs after ample opportunity for discovery with regard to the issues presented. The motions are ripe for a ruling thereon.

Plaintiff is the Receiver for Life Insurance Company of America (LICA). His complaint, through the fifth amendment, states ten causes of action. Causes First, Second, Fifth and Seventh arise under federal securities laws; causes Third, Fourth, Sixth and Eighth are pendent state law fraud claims; and causes Ninth and Tenth seek to state claims under RICO, 18 U.S.C. § 1961, *et seq.* In summary, plaintiff complains of three securities frauds, which drained the resources of LICA until it was forced into receivership. The three securities frauds alleged are: (1) the Calvin Wilson transaction; (2) the Transamerican Securities Company, Inc. transaction; and (3) the Advanced Education, Inc. transaction. The various motions now before the court present a variety of issues but this memorandum of decision will address only the affirmative defense of the statute of limitations addressed to the first eight causes of action and the failure of the Ninth and Tenth causes of action to state a claim under RICO upon which relief may be granted.

The following facts are either not in dispute or are stated most favorably from the

standpoint of the plaintiff. In the mid-1970s Royal American Corporation (RAC) owned at least 51% and maybe as much as 60% of the common stock of Pacific American Corporation (PAC), which owned 100% of the stock of LICA, which owned 67% of the stock of Investors Corporation of America (ICA), which owned 100% of International Resorts, Inc., which owned a property known as Point Aquarius Country Club. While the officers and directors of the foregoing were not identical, there was sufficient common identity of officers and directors to assume validity to the allegations in the complaint that certain of the defendants who were officers and directors of such corporations, through the dominance and control of other officers and directors who are not defendants, dominated and controlled the corporations. LICA was an insurance company which at all times was subject to the supervision of the Department of Insurance of the State of Alabama.

As stated earlier, the causes of action pursued in the complaint center around three alleged fraudulent transactions.

The Calvin Wilson transaction, as alleged, involved a scheme by all defendants to divert $500,000 from LICA into ICA, a financially troubled company in which LICA owned a two-thirds interest. Since the schemers felt a direct transfer of funds from LICA to ICA might result in an undesirable response by the Alabama Department of Insurance, the object of the scheme was accomplished in June of 1975 through the use of a straw man, Calvin Wilson. Wilson borrowed $500,000 from American Bank and used it to purchase from ICA 1,000,000 shares of its stock, pledging the stock to American Bank as security for the loan. As further security for the loan, the defendants had LICA guaranty payment of the loan. Upon Calvin Wilson's default, LICA paid American Bank the $500,000 and received an assignment of the pledged 1,000,000 shares of ICA stock. Plaintiff's First through Fourth causes of action arise out of the factual setting of the Calvin Wilson transaction and are pursued against all defendants.

The Transamerican Securities Company, Inc. transaction, as alleged, involved a scheme by certain of the defendants to divert funds from LICA to another company which some LICA board members controlled, Transamerican Investment Company, Ltd. This transaction occurred on June 2 and 3, 1977. Transamerican Investment Company, Ltd. is the holding company for Transamerican Securities Company, Inc. LICA, using its demand note, purchased from Transamerican Investment Company, Inc. eight $50,000 debentures (presumably the debentures were issued by Transamerican Securities Company, Inc.) maturing in three years, bearing interest at an annual rate of 10%, payable monthly, beginning July 1, 1977. The demand note used to purchase the debentures was secured by a $400,000 irrevocable letter of credit. Although not alleged, the letter of credit apparently was the outgrowth of a simultaneous delivery by LICA of its $400,000 promissory note to First National Bank of Oxford, secured by a mortgage of real estate (Point Aquarius Country Club) owned by International Resorts, Inc., a corporation wholly owned by ICA. Only one monthly interest payment on the debentures was received by LICA. The debentures have not been located and there is no evidence that LICA was paid for the debentures at the stated maturity thereof. Plaintiff's Fifth and Sixth causes of action arise out of the factual setting of the Transamerican Securities Company, Inc. transaction and are pursued against certain of the moving individual defendants, plus defendants Donald E. Hinds, Jack R. Tanner, Matthew E. Wright and George Pihakis.

The Advanced Education, Inc. transaction, as alleged, involved a scheme by American Bank and certain of the defendants to drain funds from LICA. American Bank was trustee for education bonds sold by Advanced Education, Inc. designed to help parents pay the

cost of their children's college educations. At some point in time, American Bank and Advanced Education, Inc. became aware that the Advanced Education, Inc. investment portfolio was insufficient to pay the education bonds as they came due. On or about July 23, 1974, they set out to avoid liability for this discrepancy. Advanced Education, Inc. borrowed $300,000 from American Bank. Advanced Education, Inc. used this $300,000 in cash and the entire Advanced Education, Inc. investment portfolio to purchase a $600,000 convertible debenture from ICA. LICA guaranteed this debenture. Advanced Education, Inc. used this debenture as collateral on its $300,000 loan from American Bank. Apparently simultaneously, Advanced Education, Inc. returned to ICA its $600,000 debenture in exchange for ICA's agreement to assume, unconditionally, all the debts, liabilities and obligations of Advanced Education, Inc. (including the $300,000 note payable to American Bank and the education bonds). LICA guaranteed ICA's assumption of these liabilities. Plaintiff's seventh and eighth causes of action arise out of the factual setting of the Advanced Education, Inc. transaction and are pursued against American Bank, certain of the moving individual defendants and defendants George Pihakis, Matthew E. Wright and Jack R. Tanner.

The financial affairs of LICA became so bad that in late 1978 the Commissioner of Insurance commenced an action in the Circuit Court of Jefferson County, Alabama, seeking the appointment of a receiver for LICA. On December 15, 1978, that court appointed Charles E. Crawford, Chief of Receivership Division of Alabama Department of Insurance, as Receiver "of all the property, assets and estate" of LICA and directed the Receiver "to take immediate possession of said property, including the premises and all rights of action, as well as the books, papers, evidence of debt and all other property of every kind whatsoever belonging" to LICA. The Receiver was expressly authorized by statute and directed by court order to hire legal, clerical, managerial and other employees necessary to discharge his responsibility. Plaintiff W. Larry Hunt is the successor Receiver, having been appointed by the state court on January 23, 1980.

 The federal securities law contains no statute of limitations for 10b–5 claims. Therefore, a court must look to the law of the forum state for the closest substantive state cause of action and graft the statute of limitations from that cause of action onto the federal securities fraud claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In Alabama, the choice is between the one-year statute for common law fraud, *Ala.Code* § 6–2–39 (1975), and the two-year period applicable to actions under the Blue Sky law. *Ala.Code* § 8–6–19(e) (1975). *Diamond v. Lamotte*, 709 F.2d 1419 (11th Cir.1983), explains the method of determining the proper statute of limitations. First, the court must compare the essential elements of the federal cause of action with the available choices under state law, looking not just to the elements of the causes of action, but also comparing the similarities of purpose that underlie the state and federal causes of action, in choosing the most analogous state cause of action. Second, the period of limitations for the state categorization of the action is applied, unless the categorization or the limitation period is inconsistent with federal policy. *Id.* at 1422. The primary distinction between the Alabama Blue Sky law and the federal securities law 10b–5 claim is that the Alabama securities fraud remedies can only be sought by a purchaser whereas the federal remedy is open to both sellers and purchasers. *White v. Sanders*, 650 F.2d 627 (5th Cir.1981) (Unit B), explained that where a purchaser is alleging that it was defrauded, that distinction between the state and federal securities laws is of no moment. Thus in the instant action where LICA occupied the position of a purchaser, the applicable statute of limitations for the federal securities law claims is two years. Of course, plaintiff's common law fraud claims are

governed by the one-year period of limitation. *Ala.Code* § 6–2–39 (1975).

The pivotal question in the instant case is when the period of limitations began to run. Regardless of the state statute of limitations adopted, a federal court is bound to follow the federal rule with regard to when the clock starts running. *White v. Sanders,* 650 F.2d 627, 630 (5th Cir.1981) (Unit B). The test for when the statute begins to run is an objective one. The plaintiff's actual knowledge need not be proved. At that time when the plaintiff knew or should have known of facts sufficient to indicate that the fraud had taken place, the statute begins to run. Thus, for our purposes, the inquiry must concentrate on when the holder of the claim had either actual knowledge of the alleged violation or notice of facts which, with the exercise of due diligence, would have led to actual knowledge thereof. *First Federal Savings and Loan Association of Miami v. Mortgage Corporation of the South,* 650 F.2d 1376 (5th Cir.1981) (Unit B); *Vigman v. Community National Bank & Trust Company,* 635 F.2d 455 (5th Cir.1981); *Azalea Meats, Inc. v. Muscat,* 386 F.2d 5 (5th Cir.1967).

The instant action was commenced April 22, 1981, approximately six years after the Calvin Wilson transaction, approximately four years after the Transamerican Securities Company, Inc. transaction and approximately seven years after the Advanced Education, Inc. transaction. The claims embraced in the action belonged to LICA. While LICA knew of the existence of the fraudulent transactions at the time the transactions took place because it was a party to the transactions, the court is assuming *arguendo* complete domination and control of LICA by the defrauding officers and directors. Therefore the running of the statute of limitations would not begin until knowledge concerning the alleged fraudulent transactions was available to persons or entities other than LICA or its officers and directors who had the right to pursue avenues of redress, on behalf of LICA, for the alleged fraudulent transac-

tions. Where a corporation, such as LICA, fails to pursue a claim which is owned by it, shareholders of the corporation are permitted to bring a derivative action to redress the injury to the corporation. Of course, a receiver appointed to represent a corporation has the right to pursue such claims; but more importantly, a receiver often has a duty imposed by a court and by statute to pursue such claims. Thus the statute of limitations may begin to run when it is clear that shareholders of the corporation, with an interest in redressing wrongs against their corporation, are or should be aware of the fraudulent activities damaging their corporation. If such knowledge or notice of facts is never garnered by shareholders, then the statute may begin to run when a court appointed receiver knows of the fraudulent transaction or acquires notice of facts which with the exercise of due diligence would lead to actual knowledge thereof. Since PAC was the sole stockholder of LICA, we must look to the shareholders of PAC to determine whether those shareholders knew of the fraudulent activities. At this point, the court is assuming PAC was dominated and controlled by the same interlocking directors and officers that controlled LICA. While RAC did own a controlling interest in PAC, there was substantial ownership of the shares of PAC which was clearly not controlled by RAC or any of the interlocking directors and officers. These independent shareholders had actual knowledge of extensive frauds perpetrated upon LICA at least by September of 1976.

In September of 1976, Wesley Lambert, Jr. and Fletcher E. Jones, both shareholders of PAC, instituted a derivative action in this court under FRCP Rule 23.1 for the use and benefit of PAC and LICA against American Bank and many of the same individual defendants named as defendants in the instant action. The action was styled *Wesley Lambert, Jr., et al. v. Pacific American Corporation, et al.,* CV76–H–1249–S. In the same month an action was commenced in the Circuit Court of Jefferson County, Alabama, under Case Number

200–531, pursuing identical claims against the same defendants, with the exception of American Bank. The complaint in the *Lambert* case expressly alleges that the shareholders of PAC had made demand on the officers and directors of PAC and LICA to take action on behalf of LICA in connection with the various wrongs perpetrated on LICA which were enunciated in the *Lambert* complaint. The *Lambert* complaint described a variety of alleged frauds against LICA, including the Calvin Wilson transaction and the Advanced Education, Inc. transaction. The *Lambert* complaint demonstrates that non-dominated PAC shareholders had actual knowledge of the Calvin Wilson transaction and the Advanced Education, Inc. transaction *and* that those shareholders pursued avenues available to them to redress those and other wrongs committed against LICA.

■ Paragraph 10 of the *Lambert* complaint describes the Advanced Education, Inc. transaction as follows:

10. In July 1974 the Louisiana directors made arrangements for ICA to issue a Six Hundred Thousand ($600,000.00) Dollar Fourteen (14%) Percent convertible debenture to Louisiana Bank in exchange for the trust portfolio of Advanced Education, Inc. held by Louisiana Bank. As additional consideration PAC, LICA, ICA and IRI [International Resorts, Inc.] were caused to guaranty the liability of Advanced Education, Inc. to the purchasers of its pre-paid college expense plans. The burden of said guaranty was concealed from PAC and LICA and said burden is greatly in excess of the value of the assets received and has cost in excess of Three Hundred Thousand ($300,000.00) Dollars in three years. The value of the investment portfolio was overstated, consisting of approximately Three Hundred Thousand ($300,000.00) Dollars in liquid assets and approximately Three Hundred Thousand ($300,000.00) in mortgage notes having a loan value of not more than half. Plaintiff avers that said mortgage notes were issued by a company in which an associate or former associate of Defendant, McCollister was interested. Plaintiff further avers that said mortgage notes were pledged to Louisiana Bank by Defendants for a loan to ICA of One Hundred Fifty Thousand ($150,000.00) Dollars.

Paragraph 13 of the *Lambert* complaint describes the Calvin Wilson transaction as follows:

13. During sometime in 1975 or 1976 the Louisiana Defendants and RAC entered into an agreement to sell RAC's stock in PAC for Three and .75/100 ($3.75) Dollars per share or approximately Two Million Nine Hundred Thousand ($2,900,000.00) Dollars to a purchaser. As a part of said plan or scheme the Louisiana directors caused ICA to issue One Million (1,000,000) Shares of Fifty (50) Cent par stock to said Purchaser who demanded control of ICA to enter into the agreement with RAC. One Million (1,000,000) Shares represented Thirty-three (33%) Percent of the capital of ICA. In order to consummate said sale, the Louisiana directors caused purchaser to borrow the purchase price of approximately Three Million Four Hundred Thousand ($3,400,000.00) Dollars from Louisiana Bank, secured by said stock. They caused LICA to either initially guaranty, or upon default by the purchaser to purchase the said shares in ICA for Five Hundred Thousand ($500,000.00) Dollars, thus transferring an additional Five Hundred Thousand ($500,000.00) Dollars from LICA to ICA.

It cannot seriously be argued that the shareholders of LICA were not pursuing derivative claims on behalf of LICA to redress injury to LICA caused by the Advanced Education, Inc. transaction and the Calvin Wilson transaction. Likewise, because of the extensive allegations of fraud in the *Lambert* complaint, it cannot seriously be argued that the same stockholders were not on notice of facts which, with the exercise of continuing due diligence would have also led them to actual knowledge of the Transamerican Securities Company,

Inc. transaction when it occurred. The applicable two-year statute of limitations began to run at least by September 8, 1976 when the *Lambert* complaint was filed and the causes of action based on securities fraud associated with the Calvin Wilson transaction and the Advanced Education, Inc. transaction were effectively barred as of September 8, 1978, three months prior to the appointment of the Receiver for LICA. Of course, the causes of action based upon common law fraud arising from those transactions were barred as of September 8, 1977, fifteen months prior to such appointment. The shareholder knowledge of the wide variety of frauds perpetrated by the dominating officers and directors of LICA reflected in the *Lambert* complaints would, for purposes of the statute of limitations, also demand continuing inquiry by those shareholders into the affairs of LICA. By virtue of the notice to the shareholders afforded by the descriptions of the securities and other frauds in the *Lambert* complaint, an objective test with regard to the commencement of the running of the statute of limitations for the Transamerican Securities Company, Inc. transaction would result in the statute beginning to run either at the time of the transaction itself (June 3, 1977) or at the time of the LICA Board of Directors' meeting approving the transaction (July 2, 1977), or at the time of non-payment of interest due on the debentures (August 1, 1977 and the first day of *each* month thereafter). In any event, shareholders with knowledge of the pervasive frauds described in the *Lambert* complaint should have known of the Transamerican Securities Company, Inc. transaction at least by the fall of 1977. *See generally Armstrong v. McAlpin*, 699 F.2d 79 (2nd Cir.1983). The common law fraud claim based on that transaction was barred by the one-year statute of limitations prior to the appointment of the Receiver, and the securities fraud claim based on that transaction was barred by the two-year statute of limitations long before plaintiff commenced the instant action.

The foregoing is a sufficient basis upon which to grant the pending motions for summary judgment addressed to causes First, Second, Third and Fourth in the amended complaint and, after proper notice, to convert the pending motions to dismiss into motions for summary judgment and to grant them as addressed to causes Fifth, Sixth, Seventh and Eighth. But there is a separate and independent reason why the claims set forth in causes First through Eighth are barred by two-year (securities fraud claims) and one-year (common law fraud claims) statutes of limitations. That reason concerns the delay by the Receiver in bringing this action until twenty-eight months after his appointment.

A receiver stands in the shoes of the corporation and can only assert those claims that the corporation could assert. *See Lank v. New York Stock Exchange*, 548 F.2d 61 (2nd Cir.1977); *Ex Parte Wilkinson*, 220 Ala. 529, 126 So. 102 (1930). *See also Porter v. Sabin*, 149 U.S. 473, 13 S.Ct. 1008, 37 L.Ed. 815 (1893). Thus, were the court not assuming that LICA was under the domination and control of defrauding officers and directors, the Receiver would be barred by the applicable statute of limitations. But, because of that domination and control, the running of the statute is tolled, but only *during the period of domination and control. See generally Armstrong v. McAlpin*, 699 F.2d 79 (2nd Cir.1983). That domination and control of LICA ended when the Receiver was appointed on December 15, 1978. The period of tolling ended and the statute began to run at that time. The undisputed facts hereafter discussed demonstrate that the Receiver, at the time of his appointment, at the very least had notice of facts which with the exercise of due diligence would have led to actual knowledge of the subject frauds. As pointed out in *Armstrong*, supra, at page 88.

> The test as to when fraud should with reasonable diligence have been discovered is an objective one. *Warner v. Republic Steel Corp.*, 103 F.Supp. 998, 1009 (S.D.N.Y.1952). "[T]he means of knowledge are the same thing in effect as knowledge itself." *Wood v. Carpenter,*

101 U.S. [(11 Otto)] 135, 143, 25 L.Ed. 807 (1879). "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Higgins v. Crouse,* 147 N.Y. 411, 416, 42 N.E. 6 (1895). This rule is fully applicable in cases such as the instant one, which involve claims of securities fraud.

A receiver who is brought in to manage a failing insurance company is on notice of problems with the company by virtue of the fact that he is needed. Furthermore, the court order appointing the Receiver specifically directs him to take charge of every aspect of the company and to rehabilitate the company. *See* Decree for Injunction and Appointment of a Receiver, *Payne, Commissioner of Insurance v. Life Insurance Company of America,* CV78 505–498 WCB (December 15, 1978 Circuit Court of Jefferson County, Alabama, Equity). As noted earlier, *Ala.Code* § 27–32–15 (1975) authorizes the Receiver to employ such counsel, clerks and assistants as he deems necessary. The Receiver must be held to the highest level of "due diligence" in ferreting out those claims held by LICA.

A strict application of the statute of limitations to the Receiver imposes no undue hardship under the facts established in the instant case. A receiver for an insurance company in Alabama is only appointed after an examination of the company reveals that it is "impaired," i.e., a finding that its liabilities exceed its assets. Weaver depo. at 27. The product of that examination is in the hands of the Alabama Department of Insurance. A receiver is selected by the Commissioner of Insurance and then established by court order. It would be a gross admission of governmental inefficiency not to charge such a receiver with notice of facts determined by the pre-receivership investigation, particularly under the facts in this case.

The first receiver for LICA was Charles E. Crawford. Mr. Crawford was a Deputy Commissioner and Chief of the Receivership Division of the Alabama Department of Insurance. His immediate supervisor was the Commissioner of Insurance of Alabama—the head of the Alabama Department of Insurance (Crawford deposition at 12, 15). Plaintiff in the case at bar, W. Larry Hunt, was Mr. Crawford's successor as Receiver of LICA. Mr. Hunt is also an employee of the Alabama Department of Insurance and Chief of the Receivership Division of that department (Hunt depo. at 6–7). By statute the rehabilitation, liquidation, reorganization and conservation of insurers is the responsibility of the Commissioner of Insurance. *Ala.Code* § 27–32–1, *et seq.* (1975). Information that the Department of Insurance had must be imputed to the Receiver who was wearing two hats, the hat of the Receiver for LICA and the hat of Chief of the Receivership Division of the Department of Insurance.

The Department of Insurance began its investigation of LICA in the early part of 1975 (Weaver depo. at 22). The Calvin Wilson transaction took place on June 19, 1975. In Otis D. Weaver's December 12, 1975 report to the Commissioner of Insurance on the examination of the affairs and financial conditions of LICA, he comments

On June 19, 1975, I.C.A., an affiliate of LICA sold Calvin Wilson 1,000,000 shares of I.C.A. stock at $.50 per share. The $500,000.00 to purchase this stock was loaned to Calvin Wilson by the American National Bank of Baton Rouge, Louisiana. The Life Insurance Company of America unconditionally guaranteed repayment of the loan if not paid by Calvin Wilson on December 16, 1975. The $500,000.00 loaned to Mr. Wilson was paid into I.C.A. I.C.A. was desperately in the need of cash at this time in order to meet due obligations. The $500,000.00 was looked upon by the examiners as a means of getting funds into I.C.A. at this time. It was requested that the Company furnish financial statements from Calvin Wilson indicating as

to his ability to meet this obligation. No financial statements were available.

American Bank Exhibit 2 to deposition of Otis Weaver. In his March 31, 1976 report on the condition of LICA as of December 31, 1975, Weaver explained that the loan to Calvin Wilson was not paid on the due date and had thus become a liability of LICA. American Bank Exhibit 3 to deposition of Otis Weaver at page 51.

The conflict of interest that underlay this transaction was apparent from the Annual Statement for the year ended December 31, 1975, in which the interlocking directorships of ICA and LICA are reported and graphically demonstrated. *See* American Bank Exhibit 5 to Deposition of Otis Weaver. Furthermore, the examiner was well aware that Rolfe McCollister, the Chairman of the Board of LICA, was also a director of American Bank (Weaver depo. at 77–79). Mr. Weaver testified that he understood Mr. McCollister "practically owned" the American Bank (Weaver depo. at 79).

In his June 29, 1978 report on the examination of LICA for the Commissioner of Insurance, Sam Alison, the Department of Insurance examiner, explains:

*Transactions involved in purchase of debentures.* During the course of this examination it was learned that on June 29, 1977, the Company filed an amendment to its Form B filing under the Alabama Insurance Holding Company System Regulatory Act which stated that *on June 3, 1977, the Company purchased $400,000 of debentures from Transamerican Investment Company, Ltd., a holding company* organized under the laws of the State of Louisiana in 1977. That company's principal asset was 100% ownership of Transamerican Securities, Inc., a Memphis, Tennessee broker-dealer which began business on April 15, 1977. It was reported in this amendment that the debentures were purchased with a note secured by an Irrevocable Letter of Credit issued by the First City National Bank of Oxford, Alabama, *in exchange for a first mortgage of $400,000 on the Point Acquarius [sic] resort develop-

ment property. One official of the Company stated that, to his knowledge, the debentures had never been purchased.* Another official of the Company stated that the $400,000 of debentures had been purchased and were still held by the Company at December 31, 1977. Other information indicated that, as of December 31, 1977, only $150,000 of the debnetures [sic] were still owned by the Company and the mortgage indebtedness due to the First City National Bank of Oxford had been reduced to $150,000. *These transactions were not reported or disclosed in the Company's 1977 annual statement.* With the exception of the mortgage which is commented upon under the asset caption "Real Estate", these transactions have not been reflected in the financial statement of this report.

American Bank Exhibit 6 to deposition of Charles Crawford at page 82. (emphasis supplied) In light of what the Receiver knew of other frauds, this report alone should have been sufficient to suggest the possibility of fraud. As noted earlier, the interest on these debentures was payable monthly beginning July 1, 1977, and the purchase of these debentures was the subject of a LICA Board of Directors' meeting on July 2, 1977, during the period of ongoing examination of LICA by the Department of Insurance. Only one payment of interest was received by LICA, the debentures were missing and no payment of the principal on the debentures was received. A receiver charged with the responsibility of running an insurance company and empowered with the ability to hire specialized assistants to assist him in running the company must be held to the highest standard of due diligence. Failure to note the nonpayment of $2,630.16 every month for three years and failure to note the absence of a $500,000 asset are not exemplary of due diligence.

Additional notice of the Calvin Wilson transaction and the Advanced Education, Inc. transaction was available from the court papers in the shareholder derivative

litigation discussed earlier. Mr. Weaver testified that the Department of Insurance reviewed the *Lambert* litigation involving LICA during the 1975–76 examination (Weaver depo. at 105). While the federal court *Lambert* case had been dismissed by December 15, 1978, when the Receiver was appointed, the state court *Lambert* case was still pending. On December 15, 1978, William Jackson was employed as counsel for the Receiver. *See Ex rel. Payne v. Life Insurance Company of America,* Case No. CV78–505–498 WAT, Order of January 26, 1979 (Jefferson County Circuit Court) (approving December 15, 1978 contract for hire of William Jackson as attorney). On April 9, 1979 (more than two years before the instant action was filed), Mr. Jackson formally entered an appearance on behalf of the Receiver in the state court *Lambert* action. Mr. Jackson had actually been involved earlier in that state action as the attorney for the Receiver of LICA. *See Lambert et al. v. Pacific American Corp.,* Case No. 200–531 Order of March 5, 1979 (Circuit Court of Jefferson County, Alabama). There simply is no doubt that concrete objective facts were available to the Receiver more than two years prior to April 22, 1981, so that had he exercised any diligence at all, he would at the very least have discovered the alleged frauds. Although not enumerated herein, the Department of Insurance had in its files prior to the appointment of the Receiver countless other documents which constitute notice of facts which, if pursued at all, would have led to actual knowledge of subject fraudulent activity. To paraphrase the court in *Armstrong,* supra, the tortuous history of LICA during the several years prior to the appointment of the Receiver was such that a fiduciary such as the Receiver who did suspect chicanery at the time of appointment must have had his head in the sand.

The court has made an earlier determination that, by reason of the actual knowledge of shareholders of PAC more than two years prior to the appointment of the Receiver, all claims asserted on behalf of LICA in causes First through Eighth were barred by the applicable statute of limitations before the Receiver was appointed. Even if the court is wrong in this determination, the foregoing discussion makes plain that, more than two years prior to April 22, 1981, the Receiver either had actual knowledge of the subject fraudulent transactions or at the very least had notice of facts which with the exercise of due diligence would have led to actual knowledge thereof. That is a sufficient basis upon which also to grant the pending motions for summary judgment addressed to causes First, Second, Third and Fourth in the amended complaint and, after proper notice, to convert the pending motions to dismiss into motions for summary judgment and to grant them as addressed to causes Fifth, Sixth, Seventh and Eighth.

The court has, for the purpose of resolving the issues thus far resolved, treated the Transamerican Securities, Inc. transaction and the Advanced Education, Inc. transaction as if included in the original complaint filed April 22, 1981. They were not injected into this action until, at the earliest, May 2, 1983, with the filing of a motion for leave to file a third amendment to the complaint. The failure of the court not to discuss FRCP Rule 15(c) relation back problems should not be understood as a determination that these two transactions are the same conduct, transaction or occurrence pleaded in the original complaint. See *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.,* 666 F.2d 492 (11th Cir.1982).

The third, fourth, and fifth amendments to the complaint purport to claim damages under the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (1982), in the Ninth and Tenth causes of action. These causes of action are the subject of motions to dismiss, or, in the alternative, motions for a more definite statement, pursuant to FRCP Rule 9(b).

■ The Ninth and Tenth causes of action (as amended) allege violations of RICO, 18 U.S.C. § 1961 *et seq.,* by "reason of the use of [Life Insurance Company of

America] funds through a pattern of securities frauds to operate [other businesses], thereby drain[ing] the assets of [Life Insurance Company of America]" and by the use of the mails to accomplish the scheme. After careful consideration of the defendants' motions to dismiss, the intricate web of pleadings generated in this action, the plaintiff's memorandum brief, and the developing law regarding RICO, this court finds that the Ninth and Tenth causes of action are due to be dismissed for failure to state a claim upon which relief may be granted under 18 U.S.C. § 1961 *et seq.*

RICO provides for private civil remedies at 18 U.S.C. § 1964(c):

Any person injured in his business or property by reason of a violation of section 1962 of the chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

*Id.* A violation of section 1962 includes (a) deriving income from a pattern of racketeering activity and investing any part of that income in an enterprise whose activities affect interstate commerce; (b) acquiring through a pattern of racketeering activity any interest or control in an enterprise whose activities affect interstate commerce; (c) conducting affairs of an enterprise whose affairs affect interstate commerce through a pattern of racketeering activity; and (d) conspiring to violate (a), (b) or (c).

RICO defines a pattern of racketeering activity to require at least two acts of racketeering activity. 18 U.S.C. § 1961(5). Racketeering activity includes acts *indictable* under certain listed provisions of the United States Code, including mail fraud, 18 U.S.C. § 1341, and "any *offense* including fraud connected with a case under title 11, fraud in the sale of securities...." 18 U.S.C. § 1961(1) (emphasis supplied).

Courts have construed the requirement that the predicate acts be indictable to mean that the allegations must provide the highest level of FRCP Rule 9(b) particulari-

ty—even beyond that required in the ordinary fraud case. *E.g. Bache Halsey Stuart Shields, Inc. v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042, 1046 (D.Utah 1983). This is justified by the connotative nature of the allegations in a racketeering action and the ten-year time limit on predicate acts invoked by RICO. Thus several cases have been dismissed for the failure to provide the requisite particularity in pleading.

Other courts have looked to the RICO statutory language to imply a requirement that a plaintiff show some nexus between the racketeering and the injury received. *E.g. Hokama v. E.F. Hutton & Co.,* 566 F.Supp. 636, 643 (C.D.Cal.1983); *Waterman S.S. Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La.1981); *Adair v. Hunt Int'l Resources Corp.,* 526 F.Supp. 736, 747 (N.D.Ill.1981); *Noonan v. Granville-Smith,* 537 F.Supp. 23, 29 (S.D. N.Y.1981).

Some courts have required a "competitive" or "racketeering" injury, based on the RICO Act's ancestry—the Clayton Act. *E.g. Bankers Trust v. Feldesman,* 566 F.Supp. 1235, 1241 (S.D.N.Y.1983); *North Barrington Dev., Inc. v. Fanslow,* 547 F.Supp. 207, 211 (N.D.Ill.1980); *Waste Recovery Corp. v. Mahler,* 566 F.Supp. 1466, 1468–69 (S.D.N.Y.1983). *But see Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1288 (7th Cir.1983); *Schacht v. Brown,* 711 F.2d 1343, 1358 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983).

Still other courts have divided on the question of whether a prior criminal conviction for the predicate acts is required in order to permit a civil RICO action. *E.g. Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482 (2nd Cir.1984) *cert. granted* —— U.S. ——, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985); *Glusband v. Benjamin,* 530 F.Supp. 240, 241 (S.D.N.Y.1981); *Harper v. New Japan Securities Int'l, Inc.,* 545 F.Supp. 1002 (C.D.Cal.1982).

In a series of opinions the Second Circuit exhaustively reviewed the state of the law in civil RICO. *Sedima, S.P.R.L. v. Imrex*

*Co.,* 741 F.2d 482 (2nd Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985); *Bankers Trust Co. v. Rhoades,* 741 F.2d 511 (2nd Cir.1984), *petition for cert. filed,* 53 U.S.L.W. 2063 (U.S. Oct. 24, 1984); *Furman v. Cirrito,* 741 F.2d 524 (2nd Cir.1984), *petition for cert. filed,* 53 U.S.L.W. 2063 (U.S. Oct. 24, 1984). After reviewing the statutory language at issue, the Second Circuit panel found that "RICO ... presents a classic case of a statute whose ambiguous language needs to be construed in light of Congress' purpose in enacting it." *Sedima,* 741 F.2d at 488 & n. 17. Turning first to the legislative history, the Second Circuit found a surprising paucity of discussion of the civil treble damages remedy. The two judge majority described the lack of commentary as "a clanging silence." *Id.* at 492. The plethora of case law on the statute, catalogued above, also revealed no consensus on what civil RICO entailed. With the congressional purpose as its North Star, the Second Circuit set out to define a civil RICO action. Mixed reviews of its efforts have emerged. *E.g. Furman v. Cirrito, supra; Atlantic Federal Savings and Loan Association of Fort Lauderdale v. Dade Savings and Loan Association,* 592 F.Supp. 1089, 1092–93 (S.D.Fla.1984). This court has considered the opposing views and finds the reasoning of the *Sedima* opinion persuasive.

 *Sedima, supra,* requires the plaintiff to allege a "racketeering injury"—an "injury different in kind from that occurring as a result of the predicate acts themselves." *Id.* at 493. In neither the Ninth nor the Tenth cause of action is there any allegation that plaintiff suffered any proprietary injury by reason of a pattern of racketeering activity, which injury was different from the alleged injuries caused by the predicate acts.

Even under the less restrictive view of RICO adopted by the Eighth Circuit the plaintiff's complaint fails to state a cause of action under RICO. *See Alexander Grant & Co. v. Tiffany Industries, Inc.,* 742 F.2d 408 (8th Cir.1984) *petition for*

*cert. filed,* 53 U.S.L.W. 3672 (1985) (expressly distinguishing Second Circuit's view enunciated in *Sedima* ).

The injury to be addressed by a RICO civil action is that which results from ill-gotten gains being channelled into the lanes of legitimate commerce, thus destroying natural effects of the competitive marketplace. At the heart of the Ninth cause of action, plaintiff alleges that LICA was injured by reason of the use of its own funds through a pattern of securities frauds to operate some five different business concerns. Allegedly, the cooperation of each of these concerns drained the assets of LICA. The Tenth cause of action relies on the same injury but predicates RICO liability on the mailing of false financial statements and financial reports.

*Alexander Grant and Company v. Tiffany Industries, Inc., supra,* discussed a civil RICO claim made by an accounting firm that complained of injuries from a former client's systematic fraud in order to induce a favorable audit report. The accounting firm's complaint outlined a series of fraudulent acts by its former clients, concluding that:

(1) Tiffany's actions constitute a substantive RICO violation under 18 U.S.C. § 1962(c).

(2) Mail fraud and wire fraud are acts within the definition of "racketeering activity" in 18 U.S.C. § 1961(B).

(3) Tiffany carried out two or more such acts within a ten-year period, thus establishing a "pattern of racketeering activity." 18 U.S.C. § 1961(5).

(4) Tiffany is an interstate "enterprise," 18 U.S.C. § 1961(4), conducted through a pattern of racketeering activity by the defendants.

(5) Plaintiff was injured in his business or property by reason of a violation of section 1962, and therefore entitled to damages.

*Id.* at 410.

The Eighth Circuit expressly declined to adopt the Second Circuit's rationale in *Sedima* that led to the requirement of an or-

ganized crime or mobster activity as the cause of injury, but it did opine that its decision was consistent with the Second Circuit's opinion in *Bankers Trust Co. v. Rhoades, supra,* to the extent that a civil RICO plaintiff must allege something more than the injuries from the predicate acts. The Eighth Circuit went on to hold that the accounting firm had sufficiently alleged that its injury resulted from the operation of Tiffany through a pattern of racketeering. *Alexander Grant & Co.* at 413.

Plaintiff in the instant action does not allege anything more than injuries caused by the predicate acts. Plaintiff does allege that the predicate acts constitute a pattern of racketeering activity, but in no way does plaintiff attempt to set out how the alleged injury is a product of *racketeering* distinct from the injury caused by securities fraud or mail fraud.

Both the Second Circuit and the Seventh Circuit agree that a causation element must be imposed in civil RICO liability. *Cf. Sedima, supra,* with *Haroco, Inc. v. American National Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985). The Second Circuit's restrictive view of RICO requires "but for" causation with regard to each element of the RICO action in order for the damages to be assessed. *Bankers Trust,* 741 F.2d at 517. The Seventh Circuit, while expressly rejecting the Second Circuit's but-for test for causation, reads the statutory requirement that injury results "by reason of" a violation of section 1962 to impose a proximate cause requirement on plaintiff. Under either view, the Tenth cause of action in the instant case fails to state a claim. In the morass of pleadings generated in this case it is apparent that the alleged acts of mail fraud were not the legal cause of LICA's proprietary injuries. The Tenth cause of action is therefore due to be dismissed.

Furthermore, the most decisive prerequisite from the *Sedima* opinion is also not alleged. *Sedima* and *Bankers Trust Co.* both discuss the requirement of a prior criminal conviction as a prerequisite to civil liability. Plaintiff has alleged no prior criminal conviction of any of the defendants in the case at bar. In the only Eleventh Circuit treatment of civil RICO, the panel did not go so far as to require a criminal conviction, but it did require indicia of criminality. Thus, the Eleventh Circuit appears to lean toward limiting the development of RICO to matters that are fairly considered to be criminal. *Morosani v. First National Bank of Atlanta,* 703 F.2d 1220 (11th Cir.1983); *see also Taylor v. Bilezikian,* (Case No. 84–833 Civ –T–10) (M.D.Fla. Dec. 11, 1984), in which Chief Judge Hodges expressly dismissed a RICO civil complaint "for failure to allege a prior criminal conviction on the underlying predicate offenses." *See generally Butler Manufacturing Co. v. Convey-All, Inc.,* 605 F.Supp. 1203 (N.D.Ala.1985), where Judge Acker of this court adopted the rationale of Judge Hodges' *Taylor* opinion.

A civil treble damages action for racketeering raises the pragmatic problem of what burden of proof is to be applied. Courts and commentators have covered the spectrum of possibilities. See Matz, *Determining the Standard of Proof in Lawsuits Brought Under RICO,* Nat'l L.J., Oct. 10, 1983, at 21 col. 1; *Swanson v. Wabash, Inc.,* 577 F.Supp. 1308 (N.D.Ill. 1983); *Farmers Bank of Delaware v. Bell Mortgage Corp.,* 452 F.Supp. 1278 (Del. 1978). In a confusing approach to this difficult dilemma, a distinct minority of courts have gone beyond a FRCP Rule 9(b) requirement of particularity to require "probable cause" in the germane allegations. *Bache Halsey Stuart Shields, Inc. v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042 (D.Utah 1983).

■ The Second Circuit's requirement of a prior criminal conviction provides a sound solution to this troubled area. Instead of instructing one jury on a panoply of varied burdens of proof, the underlying criminality is made a prerequisite to the institution of the action. With the criminal conviction as a starting point, the civil

RICO provisions can justifiably be given a liberal interpretation without trampling over the rights of due process and fair trial. *See* Tarlow, *RICO Revisited*, 17 Ga. L.Rev. 291 (1983).

The Ninth and Tenth causes of action must be dismissed for failure to allege a prior criminal conviction on the underlying predicate offenses. As an additional basis for such dismissal the court finds the complaint, as amended, insufficiently particular in its allegations to permit continued prosecution of the RICO claims. While the court is well aware that a complaint need only offer a short and plain statement of the claim showing that the pleader is entitled to relief and that mere notice pleading is all that is now required, there is a limitation on the liberal pleadings rules. FRCP Rule 9(b) is that limitation. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Id.* In a civil RICO claim the plaintiff necessarily alleges that the defendant has engaged in a pattern of racketeering activity involving fraud and/or indictable offenses. Rule 9(b) plainly applies to RICO claims. The complaint fails to meet the requisite standard for particularity in pleading the proprietary injury element of a RICO action. Plaintiff does not allege the injury to business or property that resulted from the violation of section 1962 other than to state the element of the action in a conclusory fashion. The necessary particularity is not present.

For the reasons herein expressed a separate order will be entered granting the pending motions for summary judgment addressed to the First, Second, Third and Fourth causes of action and granting the pending motions to dismiss addressed to the Ninth and Tenth causes of action. The pending motions to dismiss addressed to the Fifth, Sixth, Seventh and Eighth causes of action will be treated as motions for summary judgment. As such, they will be deemed submitted for decision on April 30, 1985.